FILED
IN OPEN COURT

JUN 2 6 2015

CL...

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 1:15CR124 |
| | ) |
| MUNEEB AKHTER, | ) Honorable T.S. Ellis, III |
| | ) |
| Defendant. | ) |
| | ) |

## STATEMENT OF FACTS

The parties stipulate and agree that the allegations in Counts One, Two, Seven, Eight, Ten, and Twelve of the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

1.     Between in or about March 2014, and continuing thereafter until in or about April 2015, in the Eastern District of Virginia and elsewhere, the defendant, MUNEEB AKHTER, knowingly and willfully conspired with persons known and unknown, including Sohaib Akhter and Musaddiq Ishaq, to devise, execute, and attempt to execute a scheme and artifice to defraud Expedia, Inc., U.S. Airways, Beezid Inc., OvernightPrints.com, TechConnect, and others (hereinafter "Vendors"), to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and caused the transmission of certain writings and signals in interstate commerce for the purpose of executing such scheme or artifice to defraud, in violation of Title 18, United States Code, Sections 1343 and 1349.

2.     It was a part of the conspiracy and scheme to defraud that MUNEEB AKHTER and coconspirators would steal from Victim Company 1, an Internet-based cosmetics company,

1

credit card account information belonging to Victim Company 1's customers, who were individuals located throughout the United States and abroad (collectively "the identity theft victims").

3.　　MUNEEB AKHTER and coconspirators would use the stolen information, which included compromised credit card numbers, along with the names, addresses, phone numbers, and email addresses of the identity theft victims (hereinafter "means of identification"), to make purchases from the Vendors, which were located throughout the United States and abroad.

4.　　In or about April 2014, in Sterling, Virginia, in the Eastern District of Virginia, MUNEEB AKHTER secretly installed a computer code onto the computer system of Victim Company 1.　The code automatically emailed the credit card numbers and means of identification of the identity theft victims to email accounts controlled by MUNEEB AKHTER and Sohaib Akhter.

5.　　MUNEEB AKHTER and coconspirators were familiar with Victim Company 1 because Ishaq's mother, T.U., was the owner of the Company.

6.　　MUNEEB AKHTER and coconspirators made purchases via the Internet on the Vendors' websites.

7.　　MUNEEB AKHTER and coconspirators caused many of the goods that they purchased from the Vendors using the identity theft victims' stolen credit card numbers and means of identification to be delivered to the AKHTER residence.

8.　　MUNEEB AKHTER and coconspirators resold and attempted to resell goods and services that they purchased with the identity theft victims' information on websites including, but not limited to, Craigslist.com.

2

9.    MUNEEB AKHTER and coconspirators used stolen credit card numbers and means of identification to purchase goods and services both before and after law enforcement agents contacted MUNEEB AKHTER and Sohaib Akhter and executed a federal search warrant at their home on or about July 24, 2014.

10.    MUNEEB AKHTER and coconspirators used or attempted to use stolen credit card numbers and means of identification belonging to more than 40 individuals to purchase goods and services.

11.    Fraudulent purchases attributed to MUNEEB AKHTER and coconspirators affected more than 20 businesses.

12.    The total loss amount associated with the conspirators' credit card scheme exceeded $30,000.

13.    In addition, MUNEEB AKHTER and coconspirators attempted numerous fraudulent transactions that were halted by fraud protection methods.

14.    On or about each of the dates set forth below, in the Eastern District of Virginia and elsewhere, MUNEEB AKHTER and coconspirators, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below.

| Date | Description | Cardholder/Credit Card No. | Loss Amount |
|---|---|---|---|
| 5/9/2014 | Electronic purchase of Beedzid Bid Pack on website Beezid.com | L.L./-7882 | $550.00 |
| 5/16/2014 | Electronic purchase of marketing materials on website OvernightPrints.com | L.L./-7882 | 470.17 |

3

| 5/19/2014 | Electronic purchase of marketing materials on website OvernightPrints.com | A.H./-0110 | $697.03 |
|---|---|---|---|
| 5/26/2014 | Electronic purchase of hotel room and rental car on website Expedia.com | D.F./-1681 | $641.41 |
| 5/26/2014 | Electronic purchase of flight, hotel room, and rental car on website Expedia.com | J.R./-6665 | $641.41 |
| 5/28/2014 | Electronic purchase of flight on website of U.S. Airways | D.G./-5096 | $816.00 |
| 6/16/2014 | Electronic purchase of conference attendance on website of TechConnect | F.K/-9916 | $795.00 |
| 6/16/2014 | Electronic purchase of conference attendance on website of TechConnect | J.H./-4748 | $795.00 |

15.    Furthermore, between in or about March 2014, and continuing thereafter until in or about March 2015, in the Eastern District of Virginia and elsewhere, the defendant, MUNEEB AKHTER, knowingly and intentionally conspired and agreed with others known and unknown, including Sohaib Akhter and Ishaq, to commit an offense against the United States, that is, to knowingly and intentionally access a computer without authorization and exceed authorized access to a computer, and thereby obtain information from a protected computer, and the offense was committed for purposes of commercial advantage and private financial gain, and the offense was committed in furtherance of a criminal and tortious act in violation of the Constitution and the laws of the United States, specifically, wire fraud, in violation of Title 18, United States Code, Section 1343, as charged in Count One of the Indictment, and the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and (c)(2)(B)(i)-(iii) and 371.

4

16.    In or about March 2014, in Sterling, Virginia, in the Eastern District of Virginia, MUNEEB AKHTER, Sohaib Akhter, Ishaq, and others met in the warehouse of Victim Company 1. During the meeting, MUNEEB AKHTER and Sohaib Akhter stated a desire to hack websites in order to steal credit card information.

17.    In or about March 2014, MUNEEB AKHTER corresponded on a "dark net" exchange with an unidentified coconspirator (hereinafter "dark net coconspirator"). The dark net coconspirator was a member of a hacker collective and sought to recruit MUNEEB AKHTER. Likewise, MUNEEB AKHTER hoped to join the hacker collective. MUNEEB AKHTER sought to gain unauthorized access into Victim Company 1's computer systems, in part, in order to demonstrate his hacking abilities to the dark net coconspirator and the collective.

18.    MUNEEB AKHTER would and did surreptitiously install at least one keystroke logger on a computer used by employees of Victim Company 1 with the purpose of accessing and altering the system of computers belonging to Victim Company 1.

19.    Through the use of at least one keystroke logger, MUNEEB AKHTER would and did obtain the user name and password belonging to at least one employee of Victim Company 1.

20.    MUNEEB AKHTER gave the employee's stolen user name and password to the dark net coconspirator. The dark net coconspirator then surreptitiously installed a computer code on Victim Company 1's website. The code caused the website to collect information from the online checkout page of Victim Company 1's website. The collected information included credit card numbers and means of identification belonging to the identity theft victims, who had purchased items on Victim Company 1's website.

5

21.    The code also caused the identity theft victims' information to be sent in emails to an account with a ".ru" domain, which is associated with computers accessing the Internet from the Russian Federation.

22.    In or about April 2014, MUNEEB AKHTER created the email account credproc@hotmail.com.  In or about June 2014, MUNEEB AKHTER created the email account nsalookup@hotmail.com.

23.    In or about April 2014, in Sterling, Virginia, in the Eastern District of Virginia, MUNEEB AKHTER used the stolen Victim Company 1 employee's username and password to gain access to Victim Company 1's computer system.  MUNEEB AKHTER modified the computer code that the dark net coconspirator had installed on Victim Company 1's website so that the identity theft victims' information would be sent in emails to credproc@hotmail.com instead of the ".ru" account.

24.    The code sending information to credproc@hotmail.com caused technical problems on Victim Company 1's website.  T.U. hired a specialist to investigate and the specialist removed the malicious code.

25.    In or about June 2014, in Sterling, Virginia, in the Eastern District of Virginia, MUNEEB AKHTER installed a second computer code on Victim Company 1's website.  The second code was more difficult to detect than the first code and did not cause obvious technical problems.  The new code caused Victim Company 1's website to email the identity theft victims' information to nsalookup@hotmail.com.

26.    From on or about June 3, 2014 through on or about July 24, 2014, MUNEEB AKHTER, Sohaib Akhter, Ishaq, and coconspirators collected credit card numbers and means of

identification derived from approximately 3,000 transactions on Victim Company 1's website in the nsalookup@hotmail.com account.

27.     In or about mid-July 2014, a reporter informed MUNEEB AKHTER and Sohaib Akhter about the existence of an unexecuted state search warrant for their residence. MUNEEB AKHTER and Sohaib Akhter erased the contents of their computers and the nsalookup@hotmail.com and credproc@hotmail.com accounts with the purpose of preventing law enforcement from examining them.

28.     Although MUNEEB AKHTER and Sohaib Akhter erased the contents of nsalookup@hotmail.com in or about mid-July 2014, the account continued to collect new credit card numbers and means of identification from the Victim Company 1 website until Victim Company 1 removed the code in or about May 2015.

29.     MUNEEB AKHTER provided stolen credit card numbers and means of identification belonging to the identity theft victims to the dark net coconspirator, who then sold the information to buyers on the dark net for $5 per bundle of information. MUNEEB AKHTER received proceeds of the sales from the dark net coconspirator.

30.     Furthermore, on or about November 27, 2013, and on or about February 8, 2014, within the Eastern District of Virginia and elsewhere, the defendant, MUNEEB AKHTER, intentionally accessed a computer without authorization and exceeded authorized access to a computer, and thereby obtained information from a protected computer, and the offense was committed for purposes of commercial advantage and private financial gain, and the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Section 1030(a)(2)(C) and (c)(2)(B)(i), (iii).

31.     In or about November 2013, A.M., the CEO of Victim Company 2, a data aggregation company located in Rockville, Maryland, hired MUNEEB AKHTER and Sohaib Akhter as contractors to perform maintenance on the Company's servers.

32.     Victim Company 2's core business was aggregating data and information about federal government contracts and packaging it in products used by private government contractors and federal government agencies.

33.     In or about early November 2013, MUNEEB AKHTER told A.M. that he wanted free access to the federal contract data stored in Victim Company 2's database.  A.M. rejected MUNEEB AKHTER's request and informed him that he would have to either pay for a subscription if he wanted access to the data or enter into a profit-sharing arrangement with A.M.

34.     MUNEEB AKHTER desired access to Victim Company 2's federal contract data to help him and Sohaib Akhter tailor successful bids to win contracts and clients for their company, Warden Systems.

35.     On or about November 27, 2013, without A.M.'s knowledge or authorization, MUNEEB AKHTER modified one of the login accounts that A.M. had previously used to access Victim Company 2's databases by changing the account's password.  The modifications gave MUNEEB AKHTER access to all of Victim Company 2's federal data.

36.     Victim Company 2 charged customers more than $13,000 for the access that MUNEEB AKHTER secured through the modified account.

37.     On or about November 27, 2013, MUNEEB AKHTER used the modified login account to access data and information pertaining to several federal contracts.

38.     On or about November 27, 2013, without A.M.'s knowledge or authorization, MUNEEB AKHTER conducted "brute-force attacks" on other login accounts belonging to

Victim Company 2. MUNEEB AKHTER's unauthorized modifications of these login accounts gave him alternative "backend" means of accessing Victim Company 2's computer systems in the event that his access through A.M.'s account was compromised.

39.     MUNEEB AKHTER accessed Victim Company 2's servers via the Internet from the AKHTER residence, in Springfield, Virginia, in the Eastern District of Virginia.

40.     MUNEEB AKHTER modified the login accounts for the purpose of maintaining perpetual access to the federal data stored in Victim Company 2's database. MUNEEB AKHTER hoped to maintain this secret, unauthorized access after his contract work for Victim Company 2 ended.

41.     On or about February 8, 2014, without A.M.'s knowledge or authorization, MUNEEB AKHTER inserted a code onto Victim Company 2's servers. The code caused Victim Company 2's computer systems to vote for MUNEEB AKHTER in an online contest.

42.     On or about February 8, 2014, without A.M.'s knowledge or authorization, MUNEEB AKHTER inserted another code onto Victim Company 2's servers. This code caused Victim Company 2's computer systems to send mass emails to students at George Mason University, also with the purpose of garnering votes for the online contest that MUNEEB AKHTER had entered.

43.     On or about February 8, 2014, A.M. sent an email to MUNEEB AKHTER titled "Over 10,000 emails." A.M. wrote as follows:

Muneeb,

I believe you might have used the [Victim Company 2] server again for emailing out something. I am getting 10 emails per second as undeliverable all to GMU addresses. . . . PLEASE TAKE THIS AS A SERIOUS MATTER AND SHUT DOWN THE NON DELIVERIES NOW.

9

44.     On or about February 8, 2014, MUNEEB AKHTER wrote the following email to A.M. in response:

Dear [A.M.],

I honestly regret what I have done.  There was no reason to access your systems or place the code responsible for sending out spam to GMU emails nor was there reason to have your account host php scripts to offload cookie requests to voting servers.  I misused your trust and system, and you did provide us with friendly treatment when we arrived at your house. . . .  Aggression may leave us and our companies both in a bad position, so please, for a friend—do not go ahead with any legal actions/complaints.  The authorities who may put me on trial will also revoke access to your data.

45.     Furthermore, between in or about June 2014, and continuing thereafter until in or about March 2015, in the Eastern District of Virginia and elsewhere, the defendant, MUNEEB AKHTER, knowingly and intentionally conspired and agreed with others known and unknown, including Sohaib Akhter and Ishaq, to commit an offense against the United States, that is, to knowingly and intentionally access a computer without authorization and exceed authorized access to a computer, and thereby obtain information from a department and agency of the United States, and the offense was committed for purposes of commercial advantage and private financial gain, and the offense was committed in furtherance of a criminal and tortious act in violation of the laws of the Commonwealth of Virginia, specifically, Computer Invasion of Privacy, in violation of Va. Code Ann. § 18.2-152.5, and the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(B) and (c)(2)(B)(i)-(iii) and 371.

46.     It was part of the conspiracy that MUNEEB AKHTER, Sohaib Akhter, Ishaq, and other coconspirators known and unknown, engaged in a series of computer intrusions and attempted computer intrusions against the State Department to obtain sensitive passport and visa

10

information and other related and valuable information about State Department computer systems.

47.    On or about June 24, 2014, MUNEEB AKHTER and Sohaib Akhter had the following conversation soon after MUNEEB AKHTER was hired to work as an Information Technology Security Specialist at the Department of Homeland Security:

> Sohaib Akhter:  You gotta case the joint.  You gotta figure out exactly what's happening here and there and have an elaborate scheme built out that you'll never leave a trace.
>
> MUNEEB AKHTER:  Yeah, you first climb the ladder.  Know your shit.  Need to know who's watching.  Luckily I'm one of the people that are watching, so I know what kind of evades.
>
> Sohaib Akhter:  Yeah, but I'm pretty sure they have insider protection methods and you gotta figure that shit out.
>
> MUNEEB AKHTER:  Yeah.
>
> Sohaib Akhter:  Best not to be the first person to do shit.  See around, do it for probably a year or so, make sure that other people . . . .
>
> MUNEEB AKHTER:  We get access to a lot of different viruses, malware strains, just because you're watching the packets and you see that this thing is malicious and you can download their binaries, their weird malware.  Wonder if you could really retool it such that it becomes a weapon on your part.

48.    In or about October 2014, Sohaib Akhter was hired by ActioNet, Inc. (hereinafter "ActioNet") to perform information technology support for the State Department.

49.    From in or about October 2014 to in or about February 2015, Sohaib Akhter was assigned to a contract position within the Bureau of Consular Affairs (hereinafter "Bureau"), a division of the State Department, which administers laws, formulates regulations, and implements policies relating to consular services and immigration.  Sohaib Akhter performed his

duties at both ActioNet offices in Falls Church, Virginia, in the Eastern District of Virginia, and Bureau offices in Washington, DC, which were located in a building called SA-17.

50.     Sohaib Akhter used his contract position at the State Department to search for and access sensitive passport information belonging to coworkers, acquaintances, a former employer, and federal agents investigating him for crimes alleged in the Indictment.

51.     After accessing sensitive passport information from State Department computers, Sohaib Akhter copied, saved, and shared this information with coconspirators, including MUNEEB AKHTER.

52.     Beginning on or about February 12, 2015 and continuing thereafter until on or about February 19, 2015, in Falls Church, Virginia, in the Eastern District of Virginia, and elsewhere, Sohaib Akhter accessed a Bureau database called Passport Lockbox (hereinafter "Lockbox") without authorization.

53.     Lockbox was a Bureau program that performs payment processing, scanning of applications, and initial data entry for U.S. passport applications.  Lockbox has a computer database containing imaged passport applications associated with real individuals.  The imaged passport applications in Lockbox's database contain, among other things, a photograph of the passport applicant, as well as certain personal information including the applicant's full name, date and place of birth, current address, telephone numbers, and parent information.

54.     Between on or about February 12, 2015 and on or about February 19, 2015, Sohaib Akhter conducted approximately 119 unauthorized searches for U.S. passport records using the Passport Lockbox Lookup report.  He accessed personal passport information for approximately 62 different individuals without authorization.  Those individuals included: G.R., a DHS special agent investigating the crimes alleged in the Indictment; A.M., the CEO of Victim

Company 2; MUNEEB AKHTER; Ishaq; and himself. In addition, Sohaib Akhter attempted to access passport information for S.T., a DHS special agent investigating the crimes alleged in the Indictment.

55.     Sohaib Akhter accessed many of these individuals' Lockbox profiles pursuant to MUNEEB AKHTER's requests.

56.     In or about February 2015, Sohaib Akhter copied and removed the personal passport information associated with several of these individuals, including DHS Special Agent G.R., without authorization. He shared this information with coconspirators, including MUNEEB AKHTER.

57.     Sohaib Akhter also attempted to use his access to State Department computer systems to create an unauthorized account that would enable him to access State Department computer systems undetected. Sohaib Akhter surreptitiously installed malicious programs onto State Department computer systems in order to execute his plan to create at least one backdoor login account.

58.     In or about February 2015, Sohaib Akhter downloaded several programs to a State Department computer. These programs included malicious software, or malware, which Sohaib Akhter hoped would enable him to access State Department computers remotely.

59.     In or about February 2015, Sohaib Akhter told Ishaq that if he was able to gain remote access to State Department computer systems, he could: access information on individuals' passport applications; access and unilaterally approve visa applications without State Department authorization in exchange for payment; and create passports and visas and sell them on the dark net.

60.     Sohaib Akhter's plan to gain remote access to State Department computer systems using at least one backdoor login account was ultimately unsuccessful.

61.     In or about February 2015, Sohaib Akhter learned that he was being transferred to a new position by ActioNet and would no longer have access to SA-17.  Sohaib Akhter knew that he would lose the ability to access certain Bureau computer servers once he was transferred. As a result, Sohaib Akhter put into motion a plan to ensure that he could maintain access to desired Bureau servers even after he was transferred out of SA-17 and even if he no longer worked at the State Department.

62.     Sohaib Akhter orchestrated a scheme to secretly install a physical device at SA-17.  Once installed, the device would enable Sohaib Akhter and coconspirators to collect data from and remotely access State Department computer systems.

63.     Sohaib Akhter led the conspiracy, organized the intrusion to install the physical device, recruited coconspirators to assist in execution of the intrusion, and managed the execution of the intrusion.

64.     MUNEEB AKHTER provided technical assistance to Sohaib Akhter for the unauthorized access.  MUNEEB AKHTER programmed the physical device, known as a "gumstix," so that it would collect data from State Department computers and be utilized to transmit it to computers controlled by MUNEEB AKHTER and Sohaib Akhter and coconspirators.

65.     On the day the scheme was executed, Ishaq transported materials, including the gumstix, from MUNEEB AKHTER, located at the AKHTER residence, to Sohaib Akhter, located at SA-17.

14

66. On or about February 15, 2015, Sohaib Akhter called Ishaq and asked him to buy a drill. Ishaq purchased the drill and then, pursuant to Sohaib Akhter's request, drove to the AKHTER residence to pick up additional items from MUNEEB AKHTER. At the AKHTER residence, in Springfield, Virginia, in the Eastern District of Virginia, MUNEEB AKHTER was in the process of programming a SD card, which was later to be inserted into the gumstix. MUNEEB AKHTER gave Ishaq a bag containing a screwdriver, tape, glue, and the gumstix. Pursuant to Sohaib Akhter's request, Ishaq drove to SA-17, in Washington, DC, and delivered the bag and items to Sohaib Akhter outside SA-17. Later that day, MUNEEB AKHTER drove separately to Washington, DC, and delivered the programmed SD card to Sohaib Akhter.

67. Sohaib Akhter took all of the materials provided by MUNEEB AKHTER and Ishaq into a room inside SA-17. Sohaib Akhter removed a panel on a wall and attempted to drill a hole in the metal siding. Sohaib Akhter planned to run wires through the hole in order to connect the gumstix to Bureau servers and the building's power supply. Sohaib Akhter planned to install the gumstix and the attached cables behind the wall in such a way that the device would be undetectable.

68. Sohaib Akhter lacked the proper tools to drill through the metal siding. In addition, Sohaib Akhter broke the power regulator for the device while attempting to install it within the wall. For these reasons, Sohaib Akhter was forced to abandon the conspirators' plan to install the device.

69. On or about the evening of February 15, 2015, Sohaib Akhter called MUNEEB AKHTER and told him that he attempted to install the gumstix behind a wall inside SA-17 but was ultimately unsuccessful.

70.    Furthermore, on or about October 17, 2014, the defendant, MUNEEB AKHTER, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by answering several questions falsely on a Questionnaire for National Security Positions (hereinafter "e-QIP") administered by the U.S. Office of Personnel Management, in violation of Title 18, United States Code, Section 1001(a)(2).

71.    In or about October 2014, MUNEEB AKHTER obtained a position with defense contractor Booz Allen Hamilton.  After being hired, the defendant was required to complete an e-QIP.

72.    A section of the e-QIP form includes the following questions specifically related to the "Use of Information Technology Systems":

a.    In the last 7 years have you illegally or without proper authorization accessed or attempted to access any information technology system?

b.    In the last 7 years, have you introduced, removed, or used hardware, software, or media in connection with any information technology system without authorization, when specifically prohibited by rules, procedures, guidelines, or regulations or attempted any of the above?

MUNEEB AKHTER falsely responded "No" to these questions.

73.    These representations were false because, as MUNEEB AKHTER then and there knew, prior to completing the e-QIP, he had illegally and without proper authorization accessed computer systems belonging to Victim Company 1 and Victim Company 2.  In addition, MUNEEB AKHTER had introduced unauthorized code and programs onto computer systems belonging to Victim Company 1 and Victim Company 2.

74.    MUNEEB AKHTER falsely answered other questions on the e-QIP.  Another section instructed him to list all places of employment for the prior 10 years.  The defendant did

16

not identify his prior employment with General Dynamics, which was terminated on or about July 2, 2014, as part of his employment history.

75.     Another section of the e-QIP asked MUNEEB AKHTER if he was ever fired from a job. The defendant falsely responded "No," despite knowing then and there that he had been fired from General Dynamics on July 2, 2014.

76.     Furthermore, defendant MUNEEB AKHTER was on release pursuant to an order dated March 2, 2015, from the United States District Court for the Eastern District of Virginia, Case No. 1:15MJ123, which order notified said defendant of the potential effect of committing an offense while on pretrial release.

77.     Beginning on or about March 2, 2015, and continuing through on or about April 30, 2015, and while on release, MUNEEB AKHTER, did corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede, the due administration of justice in United States v. MUNEEB AKHTER and Sohaib Akhter, No. 1:15MJ123, in the United States District Court for the Eastern District of Virginia, in violation Title 18, United States Code, Sections 1503 and 3147(1).

78.     Beginning on or about March 2, 2015, and continuing through on or about April 30, 2015, MUNEEB AKHTER endeavored to isolate Ishaq from law enforcement officers investigating MUNEEB AKHTER, Sohaib Akhter, and Ishaq for crimes alleged in the Indictment.

79.     Soon after his March 2, 2015 release, MUNEEB AKHTER helped Ishaq to hide and avoid Special Agent G.R. He also helped Ishaq to leave the United States in order to avoid federal investigators.

17

80.    On or about March 19, 2015, MUNEEB AKHTER drove Ishaq to Washington Dulles International Airport and purchased a boarding pass for Ishaq to travel from Washington, DC, to the Republic of Malta.  Ishaq accepted the flight, which cost MUNEEB AKHTER $1,719.00, and left the United States that day.

81.    Once Ishaq arrived in Malta, MUNEEB AKHTER encouraged him to stay out of the United States until the investigation and prosecution in this case were concluded.  On or about March 24, 2015, while Ishaq was in Malta, MUNEEB AKHTER sent the following text message to A.I., a mutual friend of MUNEEB AKHTER and Ishaq:

> Yo let mu [Ishaq] know that all he needs to do is not tlk to feds no matter what n wait a few months n we can win this n bcom instant millionaires.

82.    Ishaq told MUNEEB AKHTER that he had financial problems in Malta. MUNEEB AKHTER encouraged Ishaq to travel to the Kingdom of Saudi Arabia and stay there with MUNEEB AKHTER and Sohaib Akhter's father, who lived there.

83.    Upon Ishaq's return to the United States on or about March 31, 2015, MUNEEB AKHTER continued to encourage Ishaq to avoid federal agents investigating this case.  On or about April 1, 2015, MUNEEB AKHTER sent the following message to Ishaq:

> Nigga SOP [standard operating procedure] is 2 months after one arrest they make the other..  stay outta DC area or anywhere theyd think to look..other than that you should be clear.

84.    On or about April 13, 2015, MUNEEB AKHTER sent A.I. text messages requesting that A.I. arrange a meeting between Ishaq, MUNEEB AKHTER, and Sohaib Akhter at a mosque that evening.  Later, MUNEEB AKHTER and Sohaib Akhter both texted A.I. to inquire why Ishaq did not show up for the meeting.

85.     On or about April 15, 2015, MUNEEB AKHTER sent A.I. text messages requesting A.I. arrange another meeting between Ishaq, MUNEEB AKHTER, and Sohaib Akhter.  They had the following exchange via text message:

MUNEEB AKHTER: Yo set the meet for us n him

A.I.: Mentioned that and got answer ok..but not sure y didn't

MUNEEB AKHTER: No i mean make a new meet

MUNEEB AKHTER: Ur place

A.I.: Sorry boss I dont think it will work.

86.     The acts taken by the defendant, MUNEEB AKHTER, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law.  The defendant acknowledges that the foregoing Statement of Facts does not describe all of the defendant's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.  The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this Statement of Facts.

87.     The Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against the defendant regardless of whether the plea agreement is presented to or accepted by a court.  Moreover, the defendant waives any rights that the defendant may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Dana J. Boente
United States Attorney

By: _____
John P. Taddei
Special Assistant United States Attorney (LT)

By: _____
Jennifer A. Clarke
Special Assistant United States Attorney (LT)

## Defendant's Stipulation and Signature

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MUNEEB AKHTER, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

MUNEEB AKHTER
Defendant

## Defense Counsel's Signature

We are Joseph McCarthy and Mark Petrovich, the attorneys for MUNEEB AKHTER. We have carefully reviewed the above Statement of Facts with him. To our knowledge, his decision to stipulate to these facts is informed and voluntary.

Joseph McCarthy, Esq.
Attorney for MUNEEB AKHTER

Mark Petrovich, Esq.
Attorney for MUNEEB AKHTER

21