IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CRIMINAL ACTION |
| | ) |
| SOHAIB AKHTER, | ) 1:15-cr-124 |
| | ) |
| Defendant. | ) |

REPORTER'S TRANSCRIPT

SENTENCING HEARING

October 2, 2015

---

BEFORE:     THE HONORABLE T.S. ELLIS, III
            Presiding

APPEARANCES:   JOHN TADDEI, AUSA
               JENNIFER CLARKE, AUSA
               KELLEN DWYER, AUSA
               United States Attorney's Office
               2100 Jamieson Ave.
               Alexandria, VA 22314

                  For the Government

               GADEIR I. ABBAS, ESQ.
               The Law Office of Gadeir Abbas
               1155 F St. NW, Suite 1050
               Washington, DC 20004

                  For the Defendant

                  ---

               MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                  Official Court Reporter
               USDC, Eastern District of Virginia
                  Alexandria, Virginia

1                              INDEX

2

3    RECAPITULATION BY THE COURT                          3

4    OBJECTIONS/CORRECTIONS TO PRESENTENCE REPORT         5

5    ALLOCUTION BY THE DEFENDANT                         46

6    ALLOCUTION ON BEHALF OF THE DEFENDANT               67

7    ALLOCUTION BY THE GOVERNMENT                        71

8    FURTHER ALLOCUTION BY THE DEFENDANT                 80

9    IMPOSITION OF SENTENCE BY THE COURT                 85

10           (Court adjourned)

11

12                          ---

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2

3        (Court called to order at 2:30 p.m. in USA

4    v. Sohaib Akhter.)

5        THE CLERK:  United States versus Sohaib

6    Akhter, Criminal Case Number 1:15-cr-124.

7        Counsel please note your appearance for the

8    record.

9        ATTORNEY TADDEI:  Good afternoon, your

10   Honor.  John Taddei, Jennifer Clarke and Kellen Dwyer

11   for the United States.

12       THE COURT:  All right.  Good afternoon

13   again.

14       And for the defendant?

15       ATTORNEY ABBAS:  Gadeir Abbas appearance for

16   the defendant.  Good afternoon, your Honor.

17       THE COURT:  Good afternoon.

18       Good afternoon to you, Mr. Akhter.

19       THE DEFENDANT:  Good afternoon.

20       THE COURT:  All right.  This matter is

21   before the Court for sentencing, this defendant having

22   been found guilty on the basis of a plea to Counts 1

23   and --

24       Mr. Taddei, what were the counts that --

25       ATTORNEY TADDEI:  Counts 2 and Counts 8,

1    your Honor.

2              ATTORNEY ABBAS:  That's correct, your Honor.

3              THE COURT:  Two and Eight.  Just a moment

4    while I collect my documents here.

5              (Pause.)

6              THE COURT:  Counts 1, 2 and 8.

7              ATTORNEY TADDEI:  Yes, your Honor.

8              THE COURT:  All right.

9              Counts 1 and 2, of course, are conspiracy to

10   commit wire fraud and conspiracy to access a protected

11   computer.  These all go to Victim Number 1; is that

12   correct?

13             ATTORNEY TADDEI:  Yes, your Honor, Victim

14   Company Number 1.

15             THE COURT:  And that's the mother of

16   Mr. Ishak and her company.

17             And then Count 8 is the State Department,

18   access to the State Department computer.

19             ATTORNEY TADDEI:  Yes.

20             THE COURT:  All right.  I have recited the

21   offense conduct and it's set out in some considerable

22   detail in the statement of facts that Mr. Sohaib Akhter

23   agreed to in the course of his plea colloquy.

24             Let me inquire, first of all, Mr. Abbas,

25   have you had an adequate opportunity to review the

1    presence report and to review it with your client?

2              ATTORNEY ABBAS:  Yes, I have, your Honor.

3              THE COURT:  Mr. Sohaib Akhter, have you had

4    an adequate opportunity to review the presentence report

5    and to review it with your counsel, Mr. Abbas?

6              THE DEFENDANT:  Yes, I have.

7              THE COURT:  And you fully satisfied with the

8    advice and counsel he has provided to you in this case?

9              THE DEFENDANT:  Yes, I am.

10             THE COURT:  All right, sir.  You may be

11   seated.

12             THE DEFENDANT:  (Complies.)

13        OBJECTIONS/CORRECTIONS TO PRESENTENCE REPORT

14             THE COURT:  All right, Mr. Abbas, do you

15   have any objections or corrections to any of the facts,

16   conclusions or calculations contained in the presentence

17   investigation report?

18             ATTORNEY ABBAS:  Yes, your Honor.

19             I spoke with counsel for U.S. Attorney's and

20   regarding their objection to sophisticated means --

21             It's my understanding that you all are not

22   going to be asserting it any more?

23             THE COURT:  I can't hear you.  I'm sorry.

24   Speak up.

25             ATTORNEY ABBAS:  We had -- opposing counsel

1    and myself had a discussion regarding the sophisticated

2    means enhancement that was the basis of the U.S.

3    attorney's objection.  And so just to go through --

4               THE COURT:  That's their objection, not

5    yours.

6               ATTORNEY ABBAS:  Sure.

7               THE COURT:  I am asking about yours.

8               ATTORNEY ABBAS:  Yes.  The first objection

9    that we have would be the victim counting enhancements,

10   regarding --

11              THE COURT:  Paragraph 93, you argue that it

12   didn't involve 50 or more victims, and that the 16

13   vendors are the only victims.  That's your view.

14              ATTORNEY ABBAS:  It's not -- my view is not

15   that the 16 vendors are the only victims.

16              The point that we are making is that in

17   order to use a credit card in a manner that creates a

18   victim under the victim enhancement, a credit card has

19   to be used in some manner.

20              And the government's -- the statement of

21   facts itself only indicates that 16 credit -- and I

22   believe that there has been some correction.  I believe

23   that the government's position now is that there were 18

24   credit cards used to make purchases from 16 vendors, for

25   a total of 32 victims -- I'm sorry -- 34 victims.

1          Now, that's less than 50.  And it's unclear

2    where the government -- there is ambiguity in the

3    statement of facts as to how they are getting to 50.

4          The PSR statement indicates that the way

5    that we are getting above 50 victims is by adding the 40

6    credit cards that are listed in the statement of facts

7    as having been, quote, used or attempted to be used by

8    the coconspirators.

9          But what is not clear is that -- what --

10   their definition of "attempted to use" is not comporting

11   with what, "used to create a victim" under the

12   sentencing guidelines.

13         So right now we have a situation where the

14   government can articulate 18 purchases from 16 vendors,

15   for a grand total of 34 victims, which is less than 50.

16         THE COURT:  All right.

17         Mr. Taddie, as I understood it, what you

18   were arguing is that the 40 individuals had their means

19   of identification unlawfully used by defendants, so

20   there were 40 victims and 16 vendors.  That accounts for

21   56.

22         ATTORNEY TADDEI:  Yes.

23         THE COURT:  That is over 50.

24         ATTORNEY TADDEI:  That's correct, your

25   Honor.

1          I believe Mr. Abbas's argument is that in

2     the statement of facts for Mr. Akhter, paragraph 10 and

3     paragraph 29 in the PSR, Mr. Akhter stated that he used

4     or attempted to use stolen credit card numbers and means

5     of identification belonging to more than 40 individuals

6     to purchase goods or services.

7          What that means -- and he is incorrect about

8     the 18 transactions.  It's actually upwards of 35

9     successful transactions.

10          Now in addition to that, you also have other

11     individuals where the -- where the defendant used,

12     meaning they typed in the credit card information,

13     people's names, people's addresses, clicked "submit,"

14     but fraud protection methods may have caught that.

15          Now, a definition of "use" that excludes

16     those transactions would not comport with the guidelines

17     given, you know, for example, if you consider --

18          THE COURT:  But you don't even have to rely

19     on those.

20          ATTORNEY TADDEI:  No, your Honor.

21          THE COURT:  So let's stick with the ones

22     that you -- you are saying that --

23          ATTORNEY TADDEI:  What I am saying is, I am

24     not sure where the 18 number came from.  There were 16

25     business victims identified that actually experienced

1    financial losses, and those are the ones that are listed

2    in the PSR as the companies that are due restitution.

3            Now those 16 successful -- those 16

4    businesses were victimized not just a single time, but

5    some of them were victimized on multiple occasions using

6    multiple credit cards belonging to multiple individuals.

7            And the number of those individuals is

8    approximately 35 actual transactions that were completed

9    using specific individuals' credit card numbers.

10           In addition to that, your Honor, there were

11   many instances of unsuccessful transactions where the

12   defendants use people's credit card numbers to try to

13   buy item, but weren't successful due to fraud protection

14   methods.

15           Altogether, that brings the number to far

16   above 50.

17           THE COURT:  Let's -- can you get to that

18   number, more than 50, by relying entirely on the

19   statement of facts?

20           ATTORNEY TADDEI:  I believe so, yes, your

21   Honor.  Because the --

22           THE COURT:  All right.

23           ATTORNEY TADDEI:  -- statement of facts, as

24   indicated in PSE paragraph 29, states, "Coconspirators

25   used or attempted to use stolen credit card numbers and

1    means of identification belonging to more than 40

2    individuals."

3         What that means is that they successfully

4    completed transactions and put in people's information,

5    though it was blocked by fraud protection methods, of

6    more than 40 individuals.

7         The government's argument is that those 40

8    individuals and their information comport with the

9    guidelines definition of "use," which doesn't require a

10   successful transaction; it requires, quite simply, use

11   of someone's information.

12        THE COURT:  And so to that 40 you add the 16

13   vendors.

14        ATTORNEY TADDEI:  Yes, your Honor.

15        THE COURT:  And that gives you 56.

16        ATTORNEY TADDEI:  That gives you 56.  That's

17   correct, your Honor.

18        THE COURT:  What's your response to that,

19   Mr. Abbas?

20        ATTORNEY ABBAS:  Your Honor, there is no --

21   there is no authority for the argument that the

22   government is making that, not successfully utilizing --

23   not successfully concluding a transaction is -- doing

24   something less than concluding a transaction is enough

25   to satisfy the use requirement.

```
 1                    And the reason why --

 2               THE COURT:  Is there any authority to the

 3     contrary?

 4               ATTORNEY ABBAS:  It's an open --  so -- yes,

 5     there is, I think.  So the --

 6               THE COURT:  What do you mean?  What is it?

 7               ATTORNEY ABBAS:  Well, I agree -- let me

 8     walk that back.  I think it is an ambiguous situation --

 9               THE COURT:  Is there any authority for the

10     proposition that an attempted use that is unsuccessful

11     is nonetheless a victim?

12               ATTORNEY ABBAS:  The textual basis says that

13     if you use the victim's -- if you use the means of

14     identification --

15               THE COURT:  Well, if you use it -- it

16     doesn't say "successful."  It just says use it.

17               ATTORNEY ABBAS:  But here they didn't use

18     it, right?  They obtained the victim means of

19     identification, but in -- it wasn't used in any manner.

20                    And what's important here is that the

21     government --

22               THE COURT:  It says "used or attempted to

23     use," 40 -- more than 40 individuals.

24               ATTORNEY ABBAS:  But we don't know what --

25     so they do need the attempted to use credit cards to get
```

1    above 50.  So the first --

2              THE COURT:  And do you have any authority

3    that says attempted to use is not enough for a victim?

4              ATTORNEY ABBAS:  The text of what --

5              THE COURT:  Other than the text.

6              ATTORNEY ABBAS:  No, your Honor.

7              THE COURT:  All right.

8              Do you have any authority, Mr. Taddie, that

9    covers this?

10              And what provision are we looking at?

11              ATTORNEY TADDEI:  Your Honor, we looking at

12    specifically Sentencing Guidelines -- and it's

13    Section -- let me look at my notes here, Your Honor.

14    It's Section 2B1.1(b)(2), Comment Note (4)(E).  And I'll

15    read the language for you, your Honor, that we believe

16    is operative here.

17              "In a case involving means of

18    identification" --

19              THE COURT:  I'm sorry, 2B what?

20              ATTORNEY TADDEI:  My apologize, your Honor.

21    2B1.1(b)(2), Comments Note (4)(E), capital E.

22              THE COURT:  2B1 point what?

23              ATTORNEY TADDEI:  2B1.1(b)(2) --

24              THE COURT:  Are you saying D or B?

25              ATTORNEY TADDEI:  B as in boy, your Honor.

1            THE COURT:  2B1 point --

2            ATTORNEY TADDEI:  -1.  And then Comment Note

3    (4)(E), Commentary Note (4)(E).

4            THE COURT:  All right.

5            ATTORNEY TADDEI:  And in that commentary it

6    states:

7            "In a case involving means of

8    identification, 'victim' also means" -- and then there

9    is a break -- "any individual whose means of

10   identification was used unlawfully without authority."

11           And I would direct your Honor's attention to

12   the case that we cited in our filing, United States

13   versus Melchor.  It's an unpublished case from the

14   Federal Appendix, but we believe that it's on point.

15   It's from 2014.

16           It talks about a defendant's argument in

17   which he states that the District Court erred in

18   applying a two-level enhancement for the number of

19   victims -- and I'm reading from the opinion here, your

20   Honor -- "because only victims who suffered a financial

21   loss may be counted for purpose the guidelines."

22           The opinion goes on to say, "The District

23   Court did not err by considering the individuals whose

24   identifying information was stolen by Melchor to be

25   victims for purposes of the guidelines, making the

1    enhancement appropriate."

2           It doesn't indicate that there is any

3    necessity for a successful transaction.  And, in fact,

4    that would be contrary to the plain reading of the word

5    "use."  These defendants used this information.  They

6    took it, they put it into different websites to try to

7    buy things.  And the only reason it was stopped was

8    because of fraud protection methods.

9           If actual successful transactions were

10   required, then there would be no victim of the crime of

11   attempted credit card fraud.  There would be no real

12   purpose for this additional definition of "victim"

13   beyond those who suffer actual financial loss.

14           THE COURT:  But the way it's taken into

15   account is in restitution.  If you fail to succeed in

16   your efforts, you don't have to pay money for it to a

17   victim; but the victim still counts because, in your

18   view, there is still a victim.

19           ATTORNEY TADDEI:  There is still a victim.

20   They still had their credit card information stolen and

21   used by these people.  They didn't suffer losses because

22   they weren't successful, but that doesn't change the

23   fact that it was used.

24           THE COURT:  All right.

25           Mr. Abbas, I will give you the final word.

1           ATTORNEY ABBAS:  Your Honor, there is a

2    possibility for the means of identification to be used

3    and create a victim that doesn't -- that doesn't involve

4    a culmination of a financial transaction.

5           If, for instance, Sohaib had obtained the

6    means of identification and sold that means of

7    identification to someone else, he would be using that

8    means of identification by creating --

9           THE COURT:  Your argument is he didn't

10   derive any money from it, so he shouldn't be charged

11   with it.

12          ATTORNEY ABBAS:  But it's broader than that.

13   It's that within the definition of "use" that creates

14   victims under this guideline, that attempted use, if it

15   doesn't result in any impact to the credit card holder,

16   shouldn't count as a victim.  And at this stage they

17   don't have, in the statement of facts, above 50 actual

18   uses.

19          THE COURT:  All right.

20          The objection is overruled.  I think there

21   are more than 50.  I disagree with the defendant's

22   argument that an attempted use that does not result in

23   loss is not a use.  I think an attempted use is a use

24   under the guidelines.

25          And so under the statement of facts there

1    are 40 uses or attempted to use the credit cards, and

2    the 16 victims are -- company victims are an additional

3    16.  So it's greater than 50.  So that objection is

4    overruled.

5                    What's the next objection, Mr. Abbas?

6                    ATTORNEY ABBAS:  There is the objection to

7    not granting Mr. Akhter acceptance of responsibility for

8    his conduct.

9                    THE COURT:  All right.  I'll come to that in

10   a minute.

11                   What, other than acceptance of

12   responsibility?

13                   ATTORNEY ABBAS:  The paragraph 102, applying

14   a two-level enhancement, saying that the Count 8 offense

15   involved a computer system used by the government in

16   furtherance of the administration of justice, national

17   defense or national security.

18                   The defendant makes an objection to this

19   enhancement because the government has been

20   characterizing the computer system that Mr. Akhter's

21   conduct regards as the passport lock-box.

22                   But paragraph 35 of the statement of facts

23   makes it very clear that the passport lock-box is,

24   quote, a bureau program, un-quote.  So it's not a

25   computer system.  It's a program that has technological

1    parts and doesn't -- so the way that this Court should

2    construe the computer system at issue here is, instead,

3    the CCD site access database through which Mr. Akhter

4    looked up passport information that regarded the 62

5    individuals identified in the PSR.

6            CCD site access a database that essentially

7    contain pictures of passport information.  There is no

8    ability for individuals that have access to CCD site

9    access, for those individuals to approve passport

10   applications, for those individuals to deny passport

11   applications, for those individuals to amend those

12   passport applications in any manner.  It is literally a

13   repository of pictures of passports, essentially.

14           And so because we have an enhancement that

15   says there are certain categories of government

16   databases that, if affected, require a two-level

17   enhancement, there must be government databases that

18   don't justify the enhancement.

19           And this is an example of a database that is

20   of such a low-level nature that it doesn't regard the

21   administration of justice, national defense or national

22   security.  It is simply a passport database -- it is

23   simply a database of passport pictures.

24           THE COURT:  Mr. Taddie, he says it's no big

25   deal.  It's just a database with pictures and

1    information.  You can't change anything.  You can't get

2    visas.

3                   ATTORNEY TADDIE:  Your Honor --

4                   THE COURT:  So this isn't -- doesn't

5    entitle -- or doesn't warrant the two-level addition.

6                   ATTORNEY TADDEI:  First of all, your Honor,

7    we believe the defendant's focus solely on the passport

8    database is unduly narrow, given the full scope of

9    conduct involved in this particular count.

10                  One, we -- just to step back for a second,

11   we do disagree with the assertion that this particular

12   database -- which as we have been over several times

13   now, included people's passport information visa

14   information does not have national security

15   implications, given that is the key and main document

16   used for immigration in the United States.

17                  But in addition to that, the defendant and

18   his coconspirators also targeted the broader Bureau of

19   Consular Affairs systems, and as we indicated, those are

20   systems that deal not just with passport processing,

21   they deal with consular affairs, embassies abroad,

22   consular affairs within the United States for visas.

23                  And the danger of surreptitious access to

24   these systems was exemplified by the defendant's own

25   conversations with Mr. Ishak, in which he talked about

1    if he was able to gain access, he would be able to

2    create and approve visas if he wanted to, without State

3    Department oversight, to sell them, such activities

4    unquestionably have tremendous national security

5    implications.

6            And just one last point, your Honor, on the

7    defendant's argument that there have to be some

8    government computer systems that are not covered, we are

9    not talking about someone who, you know, tried to do

10   things on, you know, the Department of Agriculture

11   system or some other U.S. Government bureau that is more

12   far afield from the center of national security.  This

13   is the Bureau of Consular Affairs, at the center of the

14   safety and security of not only our embassies abroad, as

15   well as immigration security in the United States.

16           So we believe this enhancement is proper

17   here.

18           THE COURT:  All right.

19           The matter is before the Court on the

20   defendant's objection as to Count 8 to add two levels.

21           The two levels are warranted, according to

22   the probation officer, under 2B1.1(b)(18)(i).

23           I believe that's correct, isn't it,

24   Mr. Taddei?

25           ATTORNEY TADDEI:  I believe it's

1    (b)(18)(A)(i), your Honor.

2              THE COURT:   (A)(i).  All right.

3              And I think that relates to a two-level

4    enhancement for an offense involving a computer system

5    used by a government entity in furtherance of the

6    administration of justice, national defense or national

7    security.

8              So the question before me, given Mr. Abbas's

9    argument that this is nothing but a repository of

10   passport information that can't be changed, that that

11   doesn't fall into that category -- I don't agree.

12             As the presentence report indicates and as

13   paragraph 37 of the statement of facts indicates, when

14   the defendant logged on to a State Department computer,

15   he got a warning that told him:  You are accessing U.S.

16   Government information system.  And it went on to tell

17   him that it was use -- for government authorized use

18   only.

19             I think the information that the defendant

20   accessed via the State Department was certainly

21   sensitive information, unclassified perhaps, but

22   sensitive.  It allowed him to search for and access

23   passport information.

24             And I think it's also worth noting that in

25   the course of the offense, he also attempted to use this

1    access to create an unauthorized account that would have

2    enabled him to access State Department computer systems

3    undetected.

4              ATTORNEY ABBAS:  Your Honor, by reference to

5    the unauthorized account, are you --

6              THE COURT:  Let me finish.

7              ATTORNEY ABBAS:  I apologize.

8              THE COURT:  When I am done, then I will ask

9    you if I have anything.  In the meantime, listen.  You

10   may be seated.

11             ATTORNEY ABBAS:  (Complies.)

12             THE COURT:  As I said, he attempted to use

13   his access to create an unauthorized account that would

14   have enabled him to access the State Department computer

15   system.

16             There was a scheme, where he ultimately was

17   unsuccessful, to install a physical device at a State

18   Department building.  And had that scheme been

19   successful, it would have allowed him unilaterally to

20   approve visa applications without State Department

21   authorization.  It was, as I noted, however, ultimately

22   unsuccessful.

23             The issue here on the two-level enhancement

24   under 2B1.1 is whether -- the fact that he couldn't

25   change this information and whether -- and the fact that

1    it was merely passport information -- names, addresses

2    and so forth and passport information generally --

3    whether that falls within the category of a system in

4    furtherance of the administration of justice, national

5    defense or national security.

6             The defense argues that it is not, and I

7    disagree.  It's really that simple.

8             Have I missed anything, since you prevailed,

9    Mr. Taddie?

10            ATTORNEY TADDEI:  No, your Honor.

11            THE COURT:  Now, did you have something you

12   wanted to correct me on, Mr. Abbas?

13            ATTORNEY ABBAS:  Yes, your Honor.  I

14   apologize sincerely for interrupting.

15            THE COURT:  That's all right.

16            ATTORNEY ABBAS:  You made a comment

17   regarding the defendant attempting to create another

18   account --

19            THE COURT:  The unsuccessful one.

20            ATTORNEY ABBAS:  So --

21            THE COURT:  Oh, before that.

22            ATTORNEY ABBAS:  Well, there were

23   allegations earlier in this case regarding attempts to

24   create unauthorized accounts.  Those are not reflected

25   in the statement of facts.  And so what -- what does

1      remain --

2              THE COURT:  Well, they also are irrelevant

3      to the decision that I make here.  They are not relevant

4      to this decision.

5              ATTORNEY ABBAS:  Yes, your Honor.

6              THE COURT:  I did mention the unsuccessful

7      attempt, as indicated in paragraph 44 of the statement

8      of facts, but that, too, isn't pertinent to this

9      particular decision.

10             I think your point was that access to this

11     particular piece of the computer system did not involve

12     a -- a matter of administration of justice or national

13     defense or national security, and therefore the two

14     levels shouldn't apply.

15             ATTORNEY ABBAS:  Yes, your Honor.

16             THE COURT:  And the simple answer is, I

17     don't agree.  I think it does deal with the

18     administration of justice.  That kind of information is

19     always used and accessed for that sort of thing.

20             ATTORNEY ABBAS:  I understand, your Honor.

21             THE COURT:  But I could be wrong, and that's

22     why there is an opportunity for you to appeal my

23     decisions.

24             ATTORNEY ABBAS:  And I apologize for trying

25     to clarify in the middle of --

1          THE COURT:  That's all right.  I have

2     forgotten it.

3          All right.  Now we go on -- that was

4     paragraph 102.

5          Now as to paragraph -- the next objection

6     you have, I think, was to paragraph 103, the official

7     victim?

8          ATTORNEY ABBAS:  Yes, your Honor.

9          THE COURT:  What's that objection?

10          ATTORNEY ABBAS:  So, it's related, in the

11     defendant's view, to an objection that was sustained.

12     The -- paragraph 100 initially was calculated to provide

13     a four-level enhancement based on more than 50 victims.

14     So each of the 62 persons that had their passport

15     information accessed were initially counted as victims.

16          Prior to the final PSR, we objected, the

17     government agreed, and the final PSR reflected, quote,

18     "There is no evidence the defendant used the personally

19     identifying information of the 62 individuals whose

20     passport information he unlawfully accessed," un-quote.

21          So now we have an anomalous situation where

22     paragraph 100 is saying that there are no victims

23     besides the government, and --

24          THE COURT:  There are victims.  I just

25     recited 50 of them.  You are talking about official

1    victims.

2              ATTORNEY ABBAS:  Well -- so paragraph 100,

3    the conclusion was that the 62 individuals whose

4    passport information were unlawfully accessed, that

5    information was just accessed and not used in any

6    manner, they don't count as victims.

7              And so when we get to paragraph --

8              THE COURT:  You are talking about paragraph

9    100 of the presentence report?

10             ATTORNEY ABBAS:  Yes.

11             THE COURT:  I don't see -- paragraph 100 of

12   the presentence report?  Are we looking at the same

13   thing?

14             ATTORNEY ABBAS:  I am referring to the

15   victims that -- I am referring to the persons that

16   had -- that Sohaib Akhter looked up their passport

17   information.

18             THE COURT:  All right.  What about that?

19             ATTORNEY ABBAS:  So one of those -- one of

20   those individuals who Sohaib Akhter looked up the

21   passport information --

22             THE COURT:  Was a federal agent.

23             ATTORNEY ABBAS:  -- was a federal agent.

24             But before you can be an official victim

25   under the official victim enhancement, you need to be a

1    victim first, in the defendant's perspective.  And

2    because the official victim, the official -- the

3    government agent's passport information wasn't used in

4    any manner -- no one tried to sell it, no one tried to

5    do anything with it other than observe it --

6              THE COURT:  Well, they had conversations

7    about it, which I have read.

8              ATTORNEY ABBAS:  They had conversations

9    about it.  But at base, what the, you know, Mr. Sohaib

10   Akhter's motivation was in accessing that information,

11   that passport information, was not to sell it, was not

12   to disseminate it widely; it was to show off to his

13   friends in his circle that he had that access.  But that

14   doesn't make the government agent an official victim and

15   warrant that three-level enhancement.

16             The government cites to a few cases that

17   don't explain why -- don't provide an example of how

18   there can be no victims based on looking at information,

19   but somehow the definition of an official victim is

20   somehow broader and different.

21             And so that's why the three-level

22   enhancement for an official victim is not warranted

23   here.

24             THE COURT:  All right.

25             Mr. Taddie, do you understand what Mr. Abbas

1    is saying about --

2              ATTORNEY TADDEI:  I think I do, your Honor.

3              THE COURT:  All right.

4              ATTORNEY TADDEI:  And here is the point of

5    distinction:  My understanding of what his point is, is

6    that in paragraph 100 --

7              THE COURT:  Of the presentence report.

8              ATTORNEY TADDEI:  -- of the presentence

9    report, yes, your Honor, did not assess an increase for

10   victims under Section 2B1.1, which is the financial

11   crimes guideline, because those victims did not suffer

12   financial loss -- and similar to the argument we were

13   just having prior on the previous count group -- none of

14   those individuals' passport or personal information was

15   used.

16             THE COURT:  Well, in fact, under --

17             ATTORNEY TADDEI:  That's my understanding of

18   his argument, your Honor.

19             THE COURT:  All right.  He did get an

20   enhancement for more than 50 victims.

21             ATTORNEY TADDEI:  Under Count Group 1, your

22   Honor, yes.

23             THE COURT:  That's right.

24             ATTORNEY TADDEI:  He is talking about the

25   victims for Count Group 8, is what he is referring to.

```
 1              THE COURT:  I see.

 2              ATTORNEY TADDEI:  As I understand his

 3    argument, it's that if there are no victims under 2B1.1,

 4    there can't be an official victim under Chapter 3 --

 5              THE COURT:  Yes.

 6              ATTORNEY TADDEI:  -- specifically Chapter

 7    3A1.2.

 8              THE COURT:  What's the answer?

 9              ATTORNEY TADDEI:  Where that's wrong, and I

10    think the Eighth Circuit case that I cited, United

11    States versus Richak (phonetics), clearly states that

12    Chapter 2 and Chapter 3 involve distinct sentencing

13    concerns.  Chapter 2 has to do with victims of financial

14    crimes.  Chapter 3 specifies other relevant offense

15    conduct such as, in this case, the targeting of federal

16    agents.

17              And there is no question that the only

18    reason that Sohaib Akhter accessed Special Agent Ross's

19    information was because he was investigating him for

20    other crimes.  There would be no other reason for Sohaib

21    Akhter to be aware of Special Agent Ross's existence.

22              THE COURT:  Indeed, their conversation

23    reflects that.

24              ATTORNEY TADDEI:  Exactly.

25              And in addition to their conversation -- and
```

1    Mr. Akhter's position is that it's not relevant --

2    reflects that he was specifically targeted because of

3    this behavior, and it was evidenced by Muneeb's

4    statements that he -- you know, what's he going to do

5    with this?  He could consider selling it on the Darknet

6    to criminals who might find it valuable.

7              But we don't even need to necessarily get

8    there --

9              THE COURT:  Or otherwise use it.

10             ATTORNEY TADDEI:  Or otherwise use it.

11             The important factor here, though, your

12   Honor, is that the agent in this case was specifically

13   targeted due to his official government position, and

14   that's what makes this unique.

15             THE COURT:  The case you cited really

16   doesn't decide the question squarely.

17             ATTORNEY TADDEI:  It does not, your Honor.

18   But it does indicate the reason for why there can be no

19   victim enhancement in paragraph 100, 2B1.1, and there

20   can be an official victim enhancement.  Because the

21   definition of an official victim is broader than the

22   definition of a financial crimes victim contained in

23   2B1.1.

24             If an official victim had to suffer some

25   sort of financial loss or financial injury, then -- you

1    know, a prison guard who is beaten by a defendant, or a

2    police officer who was extorted by virtue of his job,

3    could never be an official victim, if it was shoe-horned

4    in that way.  Therefore, we think that enhancement is

5    appropriate, your Honor.

6              THE COURT:  All right.

7              Mr. Abbas, I will give you the final word.

8              ATTORNEY ABBAS:  We are not asserting that

9    we had to show some type of financial loss to the agent

10   affected, and we are definitely not arguing that the

11   agent whose passport information was looked up -- the

12   reason that Mr. Akhter looked it up was because he was a

13   government official.  That's not the argument that we

14   are making.

15             But what's --

16             THE COURT:  The reason he looked it up is

17   because he was the agent looking at them.

18             ATTORNEY ABBAS:  Yes.  Yes, your Honor.

19             THE COURT:  He wanted it either for

20   leverage, as he put it, or to sell.

21             ATTORNEY ABBAS:  There is -- and this is

22   from the government's perspective and how they

23   characterized Mr. Akhter's Akhter's action.  Some --

24   some of --

25             THE COURT:  And Mr. Ishak's statement.

1          ATTORNEY ABBAS:  But some of -- some of the

2    conduct that Mr. Akhter engaged in was explained, not by

3    a financial incentive, but is best explained, from the

4    government's perspective, as his view that he was

5    playing a game, he was trying to see what he could do,

6    and that doesn't necessarily create an official victim

7    here.

8          There is no -- there isn't any clear

9    evidence that there was any attempt to sell the passport

10   information.  There wasn't any attempt to profit from

11   the passport information.  It's not as if there was --

12   this is different than in the Count 1, Count 2

13   situation, where we are talking about attempted use of

14   credit cards, because there wasn't an -- there wasn't

15   even an attempt to use the agent's passport information.

16   It was obtained, but that doesn't create an official

17   victim.

18          THE COURT:  All right.

19          Mr. Taddie, anything further?

20          ATTORNEY TADDEI:  Your Honor, I would just

21   like to underscore the point that Chapter 3 (sic) and

22   Chapter 3 do involve distinct concerns.  Chapter --

23          THE COURT:  Chapter what?

24          ATTORNEY TADDEI:  Chapter 2 of the

25   Sentencing Guidelines and Chapter 3 involve distinct

1    concerns.  Chapter 2 deals with the specific offense, in

2    this instance the financial crimes grouped offense in

3    this hacking instance.  And Chapter 3 deals with special

4    offense characteristics.

5         And the special offense characteristic here

6    is that a specific individual, who is targeted solely by

7    virtue of their employment for the government, in this

8    case investigation of the defendant's illegal

9    activities, had his personal information, not only

10   accessed but removed.

11        And the defendant wants the high standard

12   that only people who have their passport information

13   sold or who is -- there is financial gain in it for the

14   defendant can be liable for an official victim

15   enhancement, that would unduly narrow the class of

16   official victims well beyond those who experience some

17   form of injury.

18        In this case there may not be a financial

19   injury, but there's certainly a tangible injury to

20   Special Agent Ross and his family by virtue of having to

21   deal with the fact that this information was out there.

22             THE COURT:  All right.

23        The matter is before the Court on the

24   defendant's objection to a victim-related adjustment.

25   It's special -- let's see.  It's under --

1          ATTORNEY TADDEI:  Your Honor, it's 3A1.2.

2          THE COURT:  3A1.2(a); is that right?

3          ATTORNEY TADDEI:  Yes, that's correct, your

4     Honor.

5          THE COURT:  And it's a victim-related

6     adjustment.

7          And does it add two levels or three levels?

8          ATTORNEY TADDEI:  It adds three levels, your

9     Honor.

10          THE COURT:  And it adds three levels.

11          Now, the defendant says there can't be a

12     victim here -- that's the government officer -- because

13     there was no use of the information.  It was just

14     access.  And he points out that under paragraph 100

15     there were no victims under 2B1.1(b)(2), so there can't

16     be under (3).

17          The government points out that the

18     considerations are different in Chapters 2 and 3, and an

19     official can be a victim simply by having his

20     information accessed, and has given some examples of why

21     that's so.

22          I think it is -- and the case the government

23     cites, which I think I looked at, does not resolve this

24     question directly.  What it does make clear is that

25     there are different considerations at work in Chapters 2

1     and 3.

2            That's the only purpose for which you cited

3     it, isn't it, Mr. Taddie?

4            ATTORNEY TADDEI:  That's correct, your

5     Honor.

6            THE COURT:  It doesn't resolve this precise

7     argument Mr. Abbas is making.

8            ATTORNEY TADDEI:  No, your Honor, though I

9     will point your Honor's attention to the second case

10    that we cited from the D.C. Circuit, which collects

11    cases that deal with government employee victims who are

12    properly characterized under 3A1.2, even in instances

13    where the victim did not experience financial loss or

14    use of someone's information.

15           Those cases, the defendants --

16           THE COURT:  What is the cite to that case?

17           ATTORNEY TADDEI:  It's United States versus

18    Hunter, 555 (sic) Federal Appendix 5, is the citation,

19    your Honor.

20           THE COURT:  Bring me that case, please, 555

21    Federal Appendix 5.  You will have to go print it out.

22           ATTORNEY TADDEI:  And the purpose for that,

23    your Honor, just to preview what it says, is essentially

24    that if a defendant illegally files false claims of

25    misconduct against a government official, essentially in

1    retaliation, then they are considered an official

2    victim.

3            And we used it -- again, it's not

4    specifically on point, but it rebuts the conception that

5    a defendant (sic) needs to be characterized as an

6    official victim within 2B1.1, or had their information

7    used or experienced a financial loss in order for them

8    to be considered an official victim.

9            THE COURT:  All right.

10           Mr. Abbas?

11           ATTORNEY ABBAS:  US v Hunter is narrower

12   than that.  US v Hunter really --

13           THE COURT:  Come to the podium, please.

14           ATTORNEY ABBAS:  US v Hunter presents the

15   situation where individuals are filing complaints

16   against government official in retaliation for perceived

17   wrongs or other grievances, but they are taking an

18   action that triggers a legal process that the government

19   official is then subjected to.

20           There -- it's an abuse of process,

21   essentially, claim that is creating the official victim,

22   whereas here -- and this is not to minimize the -- this

23   Court can take into account the fact that Mr. Akhter

24   looked up the passport information that regarded the

25   government official in other ways than this sentencing

1    enhancement.

2              But the fact is that an official victim

3    needs to qualify as a victim.  And here, because the

4    passport information was obtained, US v Hunter doesn't

5    indicate that that's enough for, for -- to create a

6    victim in this section.

7              THE COURT:  All right.  I am going to look

8    at this case briefly.  But I think, Mr. Taddie,

9    modestly, the case doesn't resolve the question, does

10   it?

11             ATTORNEY TADDEI:  No, your Honor.  It

12   doesn't squarely -- it doesn't squarely resolve the

13   question.

14             THE COURT:  So what do you think the case

15   really does?

16             ATTORNEY TADDEI:  I think what the case does

17   is it indicates that "official victim" is broader than a

18   victim that would fall under 2B1.1.  If someone is being

19   targeted for legal process in retaliation for their

20   official duties, that's not a victim under 2B1.1.  They

21   don't experience financial loss and there is no use of

22   their personal information.

23             In this circumstance it's very similar.  You

24   have an agent who is targeted for his role in this

25   investigation.

1              And one point of clarification on the facts.

2      This wasn't just viewing his information on the

3      computer.  Mr. Akhter actually removed it from those

4      computers.  He brought it home.  He showed it to his

5      coconspirators.  And that's how Mr. Akhter's brother had

6      it, to threaten to sell it on the Darknet.  So it goes

7      well beyond just merely viewing this.

8              THE COURT:  All right.  Just a moment.

9              (Pause.)

10              THE COURT:  Did you say 555 Federal Appendix

11     5?

12              ATTORNEY TADDEI:  554 Federal Appendix 5.

13              THE COURT:  All right.  Let me get that and

14     look at it.

15              Let's come back to that.

16              What's the next one, Mr. Abbas?

17              ATTORNEY ABBAS:  I think we are circling

18     back to acceptance of responsibility.

19              THE COURT:  All right.  Anything other than

20     acceptance of responsibility?

21              ATTORNEY ABBAS:  If it's -- if it's all

22     right with the Court, I would like to make one

23     additional comment.

24              THE COURT:  Yes, you may.

25              ATTORNEY ABBAS:  So I think when you are

1   looking at US v Hunter, Mr. Taddei's comments bring out,

2   I think, an important point, that the offense of

3   conviction matters.

4          So under the victim-related adjustment that

5   applies to official victims, it matters that the, quote,

6   "the offense of conviction was motivated by such

7   status."

8          The offense of conviction here is not that

9   Mr. Akhter looked up a government agent's passport

10   information.  The unauthorized access requires the

11   government to show some other -- that that access was

12   done in furtherance of some other lawful or tortious

13   conduct.

14          In this case, one of the distinguishing

15   characteristics between this situation and US v Hunter

16   is that the offense of conviction, there are -- the

17   Privacy Act makes it a misdemeanor to look up people's

18   passport information, but the crime -- the offense of

19   conviction in this situation is not tied to the official

20   identity of --

21          THE COURT:  Why did they --

22          (Simultaneous speaking.)

23          ATTORNEY ABBAS:  -- government official.

24          THE COURT:  -- look him up?

25          ATTORNEY ABBAS:  I'm sorry, your Honor?

1          THE COURT:  Why did they look him up?

2          ATTORNEY ABBAS:  They looked him up

3    because --

4          THE COURT:  He was investigating the offense

5    of conviction.

6          ATTORNEY ABBAS:  Yes, your Honor.  But the

7    reason that he was looking up the -- but the act of him

8    looking up the passport information of the government

9    agent is not, by itself, sufficient to sustain the

10   counts.  It's the aggregation of the criminal conduct

11   that allows the government to sustain counting.

12         THE COURT:  All right.  Thank you.

13         ATTORNEY TADDEI:  Your Honor, if I may?

14         THE COURT:  Briefly.

15         ATTORNEY TADDEI:  Specifically on pages 10

16   and 11, I believe is where the most operative language

17   was, based on the citation in my memo.

18         THE COURT:  I don't have the luxury of page

19   numbers on this, but the sentencing challenges begin

20   under Roman III.

21         (Pause.)

22         THE COURT:  All right.  I have read the

23   appropriate portion, and I think, Mr. Taddie, you have

24   accurately characterized the case as really only making

25   clear the difference between Chapter 2 and Chapter 3.

1  There, they applied the Chapter 3

2  enhancement because there were 1,400 complaints sent to

3  the inspector general for -- or falsely accusing IRS

4  employees of misconduct.  And that, in the court's view,

5  was sufficient to qualify the status of victims for

6  these people, right?

7  ATTORNEY TADDEI:  Yes, your Honor.

8  THE COURT:  False claims of misconduct.  All

9  right.

10  (Pause.)

11  THE COURT:  So really what it comes down to,

12  simply put, is the defense argues that simply accessing

13  the agent's passport information, which would include

14  his name, his address and where he traveled and that

15  sort of thing --

16  Is that right?

17  ATTORNEY TADDEI:  Your Honor, I think that

18  would be their assertion.  But our assertion is that it

19  wasn't only accessed.  They actually removed it and took

20  it home.

21  THE COURT:  Yes, all right.  So they

22  actually had it.  They had the information, copied it

23  and took it home.

24  (Continuing) -- that in the defendant's view

25  he is not a victim because nothing happened as a

1   consequence of that.  That's essentially what the

2   defendant is arguing.  He didn't suffer any monetary

3   loss.  There were no -- there were no investigations or

4   false accusations.

5            And your view is that he is an official

6   victim just by having his information copied and taken

7   home.

8            ATTORNEY TADDEI:  Yes, that is our position,

9   your Honor.

10           THE COURT:  And there is no real authority

11  in this regard for this -- I'm not sure it would make

12  any difference to my sentencing decision.

13           I know quite clearly that if I were to ask

14  the agent whether he thought he was a victim, I don't

15  have any doubt what he would say.  He would say, "Of

16  course I'm a victim."  He wouldn't want people accessing

17  his information.

18           And there is material in the record

19  indicating that the conspirators talked about what they

20  might use the information for.  They might sell it or

21  they might otherwise use it.  I don't know.

22           It's a little ambiguous whether they thought

23  they might be able to use it to coerce any activity or

24  not.  I don't see that as any possibility, and I don't

25  rest my decision on it.

1    But I do think that Chapter 2 and Chapter 3

2    have different purposes, different objectives, and I do

3    think you can be an official victim without having had

4    any monetary loss, without having had a complaint made

5    against you, as occurred in the case I looked at.  You

6    can be an official victim, as this individual was,

7    because they accessed his information and took it away.

8    How they would use it or whether they would

9    gain any money from it or anything else, I think is not

10   required for this person to have been an official

11   victim.

12   So I will overrule the objection and the

13   three level enhancement will continue.

14   Now that brings us back to acceptance of

15   responsibility.

16   This is the same issue I just had with

17   respect to his brother, Muneeb.  And unless you can tell

18   me something different, I think the case is stronger for

19   acceptance for this defendant than it was for his twin

20   brother, who engaged in some nefarious conduct while he

21   was incarcerated.  This defendant didn't.  So I am

22   inclined to grant this defendant acceptance of

23   responsibility, unless you can give me something new.

24   ATTORNEY TADDEI:  No, your Honor.  We would

25   defer to the Court on that determination.

1          THE COURT:  All right.

2          So now what we have is the following --

3          I think I have ruled on all the objections,

4     haven't I, Mr. Abbas?

5          ATTORNEY ABBAS:  Yes --

6          THE COURT:  And I'm not going to use --

7          (Simultaneous speaking.)

8          ATTORNEY ABBAS:  -- government --

9          THE COURT:  Sophisticated means.

10          ATTORNEY ABBAS:  That's the remaining --

11          THE COURT:  You were here, weren't you?

12          ATTORNEY ABBAS:  I was here, your Honor.

13          THE COURT:  All right.  Same ruling for the

14     same reasons.

15          ATTORNEY ABBAS:  Thank you.

16          THE COURT:  But now what we have is on

17     Count 1, really Counts 1 and 2 is 6 base offense level,

18     plus 6 for the loss of approximately $31,375.  That's 5;

19     plus 50 or more victims, which I have ruled on, is plus

20     4; plus, there is a 2-level enhancement for -- under

21     2B1.1(b)(17), that's for intent to obtain personal

22     information, and so the -- and this defendant gets a

23     2-level enhancement for obstruction.  This is the wiping

24     of the computers.

25          So that takes him to an adjusted offense

1    level of 20.

2            Then for Count 8, there is a base offense

3    level of 6, and he gets 2 levels for the intent to

4    obtain personal information, and plus 2 for computer

5    system used by a government entity -- I ruled on that --

6    in furtherance of the administration of justice; and a

7    plus 3 enhancement because the victim was a government

8    officer.

9            And adjustment for role in the offense, he

10   doesn't get.  Am I correct about that?

11           ATTORNEY TADDEI:  I'm sorry, your Honor.

12   Which portion was that?  I apologize.

13           THE COURT:  I'm talking about Count 8 for

14   this defendant.

15           ATTORNEY TADDEI:  Yes.

16           THE COURT:  Was he an organizer, leader or

17   manager?

18           Yes, he was.  There is a plus 2 for that.

19           ATTORNEY TADDEI:  Yes, your Honor.

20           THE COURT:  So that's a 15 total.  And,

21   therefore, he gets a combined adjusted offense level of

22   21, with minus 3 for acceptance, for a total offense

23   level of 18, and a guideline range of 27 to 33 months.

24           ATTORNEY TADDEI:  Your Honor, just -- again

25   just for purposes of the record, we would move for the

1    additional point --

2              THE COURT:  Yes.

3              ATTORNEY TADDEI:  -- under the acceptance of

4    responsibility.

5              THE COURT:  And that's granted and that's

6    obligated under the plea agreement.  And that's taken

7    into account in the numbers that I have just recited.

8              So now we proceed to allocution.

9              I otherwise adopt the findings and

10   conclusions of the presentence report as the findings

11   and conclusions in this case, except to the extent that

12   I ruled otherwise.  And the same is true as I did in the

13   other -- in his brother's sentencing.

14             Now, Mr. Sohaib Akhter, this is now your

15   opportunity to address the Court and to say anything at

16   all you wish to the Court by way of extenuation,

17   mitigation or, indeed, anything at all you think the

18   Court should know before sentence is imposed.  You don't

19   have to address the Court, but you have the opportunity

20   to do so if you wish to.

21             THE DEFENDANT:  Yes, I would like to address

22   the Court, please.

23             THE COURT:  All right, sir.  Speak up,

24   please, if you would.

25

```
1              ALLOCUTION BY THE DEFENDANT

2              THE DEFENDANT:  Your Honor, I am extremely

3    humbled and grateful for the opportunity you have given

4    me to address the Court.

5              I would like to give you a full

6    representation of who I am, through my words, as an

7    individual as to help you in determining a sentence for

8    me.

9              THE COURT:  Yes.

10             THE DEFENDANT:  This is --

11             THE COURT:  Let me -- if you don't mind, I

12   will interrupt you for a moment to say that your counsel

13   delivered, today, a ream of information, which I have

14   now reviewed.  There are many letters in there that I

15   will make a part of the presentence report.

16             I am particularly -- if you want to address

17   it, I was impressed by a letter from a woman whose

18   family you aided and supported, to some extent, a woman

19   with three children --

20             THE DEFENDANT:  Yes.

21             THE COURT:  Let me find that again.

22             THE DEFENDANT:  Terri Haynes, right?

23             THE COURT:  I beg your pardon?

24             THE DEFENDANT:  The name is Terri Haynes,

25   right?
```

```
 1              THE COURT:  Yes, Terri Haynes.  You might
 2     want to address that, too.
 3              What did you do for them?
 4              THE DEFENDANT:  So, when I was in Richmond I
 5     was away from my family who a while, and I was at
 6     Virginia Commonwealth University doing my studies over
 7     there.
 8              But I engaged in a lot of community
 9     ventures, like volunteer for Carter Elementary School,
10     or help out with the MSA, you know, project downtown,
11     where there was a lot of homeless people.  So I would go
12     out every Friday and deliver lunch to these people, and
13     I would sit down and talk to them and figure out what
14     their story was.
15              I was also a ride share for one of my
16     friends, Tamor Mahmoud (phonetics), whose letter is also
17     submitted to you.  I would take him up to Northern
18     Virginia.  I would come on the weekends to, you know,
19     stay with my family, get some food for the week, because
20     I don't know how to cook that well.
21              And in doing so, there were certain days
22     where I would just -- my friend doesn't want to go back,
23     so I would go back, I would look on craigslist for
24     places -- or people who wanted a ride somewhere.
25              And I also checked out the volunteer
```

1    section, and I found this lady who was asking for help.

2    So I decided to go and help.

3              THE COURT:  And what did you do for her?

4              THE DEFENDANT:  So at that point it was

5    nearing Christmastime and she wanted -- she needed some

6    money to keep the lights on and the electric bill and

7    things like that, as well as she wanted money to buy

8    presents for her kids.

9              So I went out and met her -- it was

10   Chesterfield.  It was about a 20-minutes drive from

11   where I was.  And I took her to the local Walmart.  We

12   bought presents.  We bought food for that Christmas.

13             And then I got engaged with her and her boys

14   and talked to them online and through phone calls.  And

15   then every now and then she would like -- she didn't

16   have the money for gas, and I would give it to her.

17             So that's basically --

18             THE COURT:  What was your relationship?

19   Just friendship and generosity?

20             THE DEFENDANT:  Yes, just friendship and

21   generosity.

22             THE COURT:  There was no romantic

23   relationship.

24             THE DEFENDANT:  No, there wasn't.

25             THE COURT:  All right.

1         THE DEFENDANT:  There were a number of other

2    homeless people that I helped, but I couldn't get their

3    contact information to be able to provide you a

4    reference from them.

5         But I -- my conduct while I was in VCU,

6    while I was in Richmond, was primarily -- you know, I

7    wanted to help people.  I was a biomedical engineer.  I

8    initially went there be a medical doctor.  But I

9    didn't have the funds to do so, and I didn't want to

10   burden my family, so I resorted to doing a master's in

11   biomedical engineering.

12        I also helped -- like one of my projects, my

13   thesis was to help blind people.  So I would go to the

14   Rehabilitation Center for Blind and Visually Impaired

15   that's in Richmond, and take the people for subject

16   tests, IRV-approved tests.  And some of them would feel

17   lonely.  I would give them company.

18        And Tamor's letter explains one of those

19   circumstances.

20        And I helped with many school activities, as

21   well, like scholastic tournaments.

22        So this is prior to, you know, me getting

23   involved with my brother in the company that we started.

24        So, I mean, I am extremely disappointed to

25   say, this case is very disappointing to me, because I

1      really wanted to work with the government.

2              And our company, after my brother won his

3      contract, his DARPA contract, for $190,000, we really

4      wanted to, you know -- we saw that as a path forward for

5      our inventive ideas, to see what problems the

6      government's have with their soliciting on their

7      websites and what, you know, we could help with.

8              So there are certain contracts that we -- I

9      applied for eight contracts.  I give you have an example

10     of two of them.  One of them was for the Army.  They

11     wanted a system on a chip to kind of analyze soldier's

12     vitals while he was in the field and report that; but

13     also energy scavenge from when he is moving around, to

14     get the energy to power the device.

15             So I proposed a voltage-gated system on a

16     chip design to them.

17             I also proposed a pneumatic load-bearing

18     suit for people for DARPA, DARPA -- but it shows my

19     commitment to our serving men and women, and that I am a

20     patriot.

21             So, between -- after I submitted these

22     contracts, we had business relations with other people.

23     A number of these business relationships went really

24     well, and they would praise our work, with the exception

25     of Victim Company 2, that my brother worked for and he

1    had unauthorized access to that computer well

2    afterwards.

3            But after that point, we didn't get any

4    money, we didn't get any contracts from the government.

5    So we decided to look for jobs.

6            And in the meantime, my brother got access

7    to credit card information, and I -- we lost track of

8    what was right and wrong.

9            We sincerely apologize to anyone that we

10   have hurt, and repay our victims their full measure.

11           But that is -- you know, it was an

12   unfortunate circumstance with the three of us, and we

13   completely lost track of what was right and wrong.

14           So then after that, we were investigated the

15   first time, July 24th is when the first raid happen.

16   After that, I was extremely, you know, sensitive.

17           I was going to go back down to VCU to

18   complete the PhD program with the biophysics department,

19   and I was -- I was being hired as a design engineer to

20   work with Dr. Jason Reid in the biophysics department on

21   his vertical scanning interferometer design and his

22   atomic force -- high-speed atomic force microscope

23   design, but he was paying me as a student, not as an

24   engineer.

25           So we had an squabble, and he decided to go

1    with someone else and withdraw his offer.

2              So, I tried to sell the car that I was using

3    to go down to Richmond, my Honda Civic hybrid, and I met

4    the head of business unit at -- for ActionNet -- and he

5    saw me as an honest person and offered me the job for

6    Department of State.

7              I loved my job at the Department of State.

8    I loved my coworkers.  They were great people.  And I

9    did -- I did amazing work for them.  I loved the

10   customers that came to me, the visa customers.  I took

11   every case with fervor and with the attention, if

12   something is happening, that I want to give it my full,

13   you know, effort to solve those problems.

14             There is a reference check form from Richard

15   Nago (phonetics) where I have highlighted the relevant

16   portions, if you would like to take a look at that.

17             THE COURT:  All right.  Give it to your

18   counsel.

19             Have you seen it, Mr. Abbas?

20             ATTORNEY ABBAS:  Yes, your Honor.  You have

21   a company of it as well.

22             THE COURT:  All right.

23             Go on.

24             THE DEFENDANT:  Okay.  So --

25             THE COURT:  Well, let's be sure I have.

1    Give it to the court security officer.

2              (Document tendered.)

3              THE COURT:  Yes, I think I have seen this.

4              Go on.

5              THE DEFENDANT:  Okay.  So I worked there for

6    a period of six months, and during those six months I

7    had no problems.  I was working on the visa system.  But

8    towards the end of my tenure there, I was being promoted

9    to a database developer.

10             I knew the developers worked with LockBox,

11   and the manager that I would be under -- Sessimal

12   (phonetics), the lady -- Sessimal is her original name,

13   but she goes by that at ActionNet.  And she was working

14   with LockBox.  So this was who I would be working for.

15             She asked me to look at LockBox.  So I went

16   onto the system on my own machine, on my designated work

17   station, government workstation.  I logged in to the CCD

18   site access with my username and my password, and I --

19   there was a search form there for a name.

20             So I typed in my name, Sohaib Akhter, just

21   to see, you know, my passport record, see what happens.

22   I was very curious.  I did not read any the warning

23   signs that were there.  I should have put them into

24   bigger consideration.

25             But I just typed in my name.  I saw my

1   passport records.  And then I typed up my friend's name.

2   I saw their passport records.  I thought it was

3   interesting.

4         So I shared it with them, and then they gave

5   me suggestions for people to look up.  I should have,

6   you know, stopped that at that point.  But I would work

7   there overnight.  I would, you know, there are certain

8   times when you don't have that many tickets to work on,

9   so I would just browse these people, and one of them was

10  the secret agent that was involved.

11        And then towards the last month there, when

12  I was -- I was supposed -- I was switching to my

13  database developer position.  I would be moving from the

14  secure location, the cleared facility, where I obtained,

15  you know, an interim secret clearance, I would be moving

16  from there to another location in Tysons Corner, so I

17  would lose access to my computer.

18        And Ishak and my brother convinced me that

19  there was -- and of course I take full responsibility

20  for organizing it -- that, you know, retaining access to

21  that system could be useful to us.  So I devised the

22  idea of using one of the tools that I had at home, the

23  Gumstix device, to retain access to that system.

24        I didn't want it for any financial means or

25  anything like that.  I simply wanted access to my tools

1   and it could be useful in some manner.

2          Towards that end, I want to kind of talk

3   about -- a little bit about the count, the Count 8.  I

4   think we had a talk about it at the plea hearing.  We

5   talked about it being, you know -- it says that

6   unauthorized access to a government computer -- or

7   exceeded authorized access to a government computer for

8   purposes of financial gain, and that I obtained

9   something of $5,000 worth or more.

10          So with regards to that, you know, we had a

11   talk -- discussion about that during the plea hearing.

12   And I said that, you know, it was for -- I agreed to

13   plead guilty.  You said that, you know you don't have --

14   don't plead something to something you didn't do.

15          So I said, "I plead guilty to that," but it

16   be based on the thing -- based on the statement that I

17   made to GS agents that I was looking for contract

18   opportunities.  I go above and beyond my duties to see

19   where I could, you know, understand the system for

20   contracts and propose contracts.

21          Because in terms of a financial -- in terms

22   of a financial motive, that was my only financial motive

23   for doing what I did.

24          And then -- and we talked about -- you said

25   you didn't completely, you know, agree with me on that.

1          My lawyer stepped up and said, you know:

2     These guys were doing a lot of things for contracting,

3     and that that contracts was a big, you know, reason for

4     why they did a lot of what did they.

5          And you -- and then John Taddie stood up,

6     the state's attorney stood up and said that there was

7     three ways we could have, you know, fulfilled the

8     statute, because there was a misdemeanor statute as

9     well.  There is the criminal statute, but there is a

10    misdemeanor statute if it wasn't financial --

11         THE COURT:  Misdemeanors are crimes, also.

12         THE DEFENDANT:  Yes, I know.  But for the

13    financial -- if the financial portion was out of it,

14    that it was a misdemeanor.  But they put the financial

15    portion in there.

16         And he said that there was three ways that

17    the financial portion could have been assessed.  It was,

18    one, if I intended to sell any of the passports; two,

19    for criminal and tortious conduct; or three, that I

20    intended to use it for government contracts.

21         And then you said, you know:  Is it

22    acceptable?

23         And the state's attorney said:  Yes, this is

24    one of the ways that the government -- or the statute

25    would have been proved.

1          So I urge that, you know, the consideration

2     for that statute be placed that I was looking for a

3     contract.

4          I would just like to talk a little bit about

5     my postarrest conduct.  I have now obtained employment

6     with Thorlabs -- they are a company that through --

7     (inaudible) -- is the staffing contract to Thorlabs --

8     as a software engineer.

9          They initially interviewed me before the

10     indictment.  And after the indictment came out there was

11     a press release saying that I was looking at 39 years.

12     So they withdrew the offer and decided to go with

13     someone else.

14          But then after that person wasn't able to

15     perform his duties, they contacted me and said:  We

16     would like to give you a chance.

17          So they have given me a chance to work at

18     their facility, and I am doing good work there.  And I

19     have a letter from my job, the director of software.  I

20     believe you might also have this, but I would like to

21     present it to you.

22          THE COURT:  All right.  I think your counsel

23     has already presented it.

24          Do they know about your conviction?

25          THE DEFENDANT:  Yes, they know.  But I

1    talked to them extensively about it, and about what I

2    could receive and, you know, the possibilities, so that

3    they are well aware.

4              THE COURT:  All right.

5              THE DEFENDANT:  So that's the main thing.

6              Will my lawyer be able to put certain things

7    up for consideration to the sentencing decision?

8              THE COURT:  Yes.  Yes.

9              THE DEFENDANT:  Okay.  So then the last

10   thing I would like to say is that my job -- my dad is

11   out of work as of 24th of September, so I am the sole

12   income earner for the family, the sole provider for the

13   family.

14             And I ask that you permit me to work for

15   three months to finish restitution to victims.  I have

16   most of the money in my bank account that are dedicated

17   to the -- to paying off restitution, but I still need

18   some more.  So it allows me to pay a restitution for the

19   victims.

20             I would also like to be able to provide for

21   my family while my father is looking for another job.

22             THE COURT:  Your father has a PhD, doesn't

23   he?

24             THE DEFENDANT:  He has a PhD, but he has

25   been without of the work force for 20 years, so -- or

1    17, 15 -- 15 to 17 years.  So -- and in Saudi Arabia.

2                    THE COURT:  He was working in Saudi Arabia,

3    wasn't he?

4                    THE DEFENDANT:  Yes.  But he was working in

5    middle management, and they were cutting middle

6    management because Alcatel-Lucent got bought out by

7    Nokia.

8                    THE COURT:  He hasn't been out of work for

9    17 years, has he?

10                   THE DEFENDANT:  He hasn't, no.  It's just

11   that he has been in one position, very focused.  It will

12   take him time to get a new position.  This give me the

13   opportunity to provide for my family while that is

14   happening.

15                   I would also like to fulfill my contract

16   with Thorlabs, so they can see that I am a productive

17   employee, and that after a term of confinement I may be

18   able to return to the job.

19                   I would like to thank you for listening.

20                   THE COURT:  All right.  You may be seated.

21                   THE DEFENDANT:  (Complies.)

22                   THE COURT:  Mr. Taddie, explain if you will,

23   please -- and I will give Mr. Abbas an opportunity --

24   what did you understand Mr. Akhter to say with respect

25   to Count 8.

1           ATTORNEY TADDEI:  I am not quite sure, to be

2    honest, your Honor.  Just looking at the statement of

3    facts -- and I can't, you know, remember exactly every

4    single thing that was said or discussed during the plea

5    hearing.

6           What I do know is that he signed and swore

7    on a statement of facts pleading guilty to conspiracy to

8    commit -- excuse me -- conspiracy to commit an offense

9    against the United States by unauthorized access to a

10   government computer system.

11          And there are enhancements related to that

12   statute based on three possibilities, one, if an offense

13   is committed for the purposes of private or financial

14   gain; two, if an offense is committed in violation of

15   the laws of state or federal entity -- in this case we

16   charge in pursuit of a violation of Virginia Code

17   18.2152.5, which is computer invasion of privacy; or,

18   three, if the value of the information obtained exceeded

19   $5,000.

20          And that was charged by the grand jury in

21   the conjunction, and the defendant indeed pled guilty to

22   a statement of facts stating that, all in conjunction,

23   as well as the indictment.  So I am not exactly sure

24   what he is doing now.

25          But it does, to me, bring up sort of a

1    somewhat troubling point, I think, in addition to some

2    of the things the defendant said during his allocution,

3    as to whether or not he fully embraces responsibility

4    for his crimes.

5            He does talk about how, with respect to the

6    State Department hack, that, "My brother and Ishak

7    convinced me that this would be a good idea."

8            He talks about, you know, how he had the

9    specific business-focus purpose.  I am not exactly sure

10   how that makes his conduct any better, even with his own

11   framing.

12           There is also no denying that he had a

13   discussion with Ishak as to whether or not he would be

14   able to unilaterally approve passport and visa

15   information, as well as the financial gain that could be

16   attended -- attended from that by selling this

17   information on the Darknet; whether or not the

18   defendant -- and he now maintains that he never actually

19   had intent to do that -- the mere factor that he

20   considered it and it was debated is nonetheless

21   extremely serious.

22           And I think one of the challenges

23   particularly in this case is there is no denying that

24   the defendant here has done some notable things with his

25   life --

1     THE COURT:  Well, I am not asking for

2 allocution yet.  I am asking to understand what it is --

3 let me ask Mr. Abbas.

4     ATTORNEY TADDEI:  Maybe Mr. Abbas has a

5 better idea, because all I know is that the defendant

6 pled guilty in the conjunction to those three

7 predicates, your Honor, in the statement of facts.

8     THE COURT:  What is it you understand your

9 client to be saying today?

10     I understood that he is saying, he is not

11 really guilty --

12     ATTORNEY ABBAS:  No, your Honor.

13     THE COURT:  -- of Count 8.

14     ATTORNEY ABBAS:  No, your Honor.  That is

15 definitely not what Mr. Akhter's point was.  Mr. Akhter

16 is guilty of Count 8, and he articulated to this Court

17 that he is guilty of Count 8.

18     What Mr. Akhter was saying was, his

19 understanding of Count 8 is that it matters what purpose

20 he had in the unauthorized access.

21     Like Mr. Taddie said, there are particular

22 enhancements that attach to particular purposes of the

23 unauthorized access.  And what Mr. Akhter was saying and

24 was offering the Court, clumsily but earnestly, was that

25 the searching that he did, the installation of the

1    Gumstix device that he did, was with the mind that:

2    Perhaps some day these things that I am doing now are

3    going to be of benefit to the company that my brother

4    and I have been trying to stand up.

5         That's the point that Sohaib was trying to

6    communicate, not as -- I think this is important -- he

7    attached the letter to the PSR report.  He wrote it.  It

8    was in his words.  You can tell.  It's not the case that

9    Mr. Akhter is trying to excuse the conduct, but he is

10   offering an earnest explanation for why he is in the

11   situation he is in.

12        And his perspective -- and I think it's a

13   correct perspective -- is that it matters why he did it.

14   And in this case, yeah, there were -- there were

15   comments about selling things on the Darknet.  There is

16   no -- Sohaib never went on the Darknet.

17        You are right -- Mr. Taddie is right that,

18   so his articulation was Mosevik (phonetics) and Muneeb

19   convinced him that this would be a good idea, but then

20   the very next sentence is:  Then I devised a plan to

21   carry out the installation of the Gumstix device.

22        Sohaib's point is a credible one.  In the

23   grand scheme of conduct among the three coconspirators

24   that engaged in largely the same conduct, it appears

25   that Mosevik and Muneeb went steps beyond -- in some

1   cases went a few steps beyond the steps that Sohaib

2   took.

3          But all of that is a very long way of saying

4   that Sohaib's point was just to explain that -- and it

5   confirms what the U.S. attorney's point was, that a lot

6   of the explanation for this conduct wasn't purely

7   financial.

8          No doubt that there is a financial benefit

9   here, but especially for Sohaib specifically, you can

10  see in the list of transactions that -- their plane

11  tickets, their rental cars, their hotels, their

12  electronic devices, and the vast majority of which

13  accrue an exclusive benefit to a single person.  In

14  almost all the cases, that single person wasn't Sohaib.

15  The single person was either Muneeb or Mosevik.

16          Sohaib is responsible for what he did.

17  There is no question about the fact that he is

18  responsible.  But -- and maybe we are getting into

19  allocution here, but this is an exceptional defendant

20  that is appearing before the Court, not just

21  exceptionally because he is really smart and he

22  graduated really early by taking a lot of credit hours,

23  but he is exceptional morally.

24          You know, I think what was really surprising

25  to the attorneys involved in this case was the

1    reluctance of the Akhter twins, despite having every

2    incentive in the world to share with us all the good

3    things that they have done in their lives, they don't

4    see it the way that we see it.  This is just what they

5    did.  This is who they are.

6            And I think it warrants a second chance, and

7    I think -- I think now we are getting a little bit

8    beside the point.  So I want to reserve.  I do have a

9    few additional comments to make.

10           THE COURT:  Oh, I am going to give you the

11   opportunity.

12           But anyway, to sum up, you are making clear

13   that he is not saying he is innocent of Count 8, that he

14   was simply pointing out that there are various ways in

15   which an offense under Count 8 might be aggravated, and

16   that he didn't do it for financial gain.

17           Is that what you are saying?

18           ATTORNEY ABBAS:  Well, so, he was looking

19   for -- he was -- the things that he did were with the

20   mind that it might allow him to get a contract in the

21   future.

22           THE COURT:  In the future.

23           ATTORNEY ABBAS:  So that's it.

24           THE COURT:  Mr. Taddie, is that your

25   understanding?

1          ATTORNEY TADDEI:  No, your Honor.

2          I think it's important that what the

3    statement of facts maintains is that we would have

4    proven these facts beyond a reasonable doubt at trial.

5    The government would have proven certain facts.  And

6    there are, indeed, three ways that an individual

7    receives an enhancement under Section 1030.

8          I think it's important to clarify that the

9    defendant, in his statement of facts, did swear that the

10   government, had it proceeded to trial, would have proven

11   beyond a reasonable doubt that the offense was committed

12   for the purpose of private financial gain or commercial

13   advantage, that it was committed in furtherance of a

14   criminal or tortious act in violation of the laws of

15   Virginia -- computer invasion of privacy -- and that the

16   value of information obtained exceeded $5,000.

17          Those were three things that he pled to in

18   this Court in a very lengthy and detailed proceeding,

19   that the government would have proved had this case

20   proceeded to trial.

21          THE COURT:  All right.

22          Anything further, Mr. Abbas?

23          ATTORNEY ABBAS:  Your Honor, that's not

24   inconsistent with what Sohaib's point was.  Sohaib's

25   point concedes that there was a violation of the law

1    that Mr. Taddie just reiterated. But Mr. Akhter is just

2    describing in specific factual detail what the content

3    of his intent was.

4                THE COURT: All right.

5                I'll hear allocution from you now.

6                THE DEFENDANT: From me?

7                THE COURT: I have heard your allocution,

8    Mr. Akhter.

9                Do you have anything else you wish to say?

10               THE DEFENDANT: I just wanted to clarify --

11   I wanted to clarify that point, because -- I wanted to

12   say that I am not -- I wasn't doing it with the intent

13   to sell passport and visa information. I was doing it

14   with the intent to get a contract one day.

15               THE COURT: All right. You may be seated.

16               THE DEFENDANT: (Complies.)

17           ALLOCUTION ON BEHALF OF THE DEFENDANT

18               ATTORNEY ABBAS: Mr. Akhter is a good person

19   that has done bad things. He's a 23-year-old young man

20   who has accomplished, as a 23-year-old, what many folks

21   decades older can't.

22               When he was still a teenager -- it

23   embarrasses me to think about what I was doing when I

24   was that age. When he was still a teenager, he created

25   a jacket to help the blind understand the objects that

1    are around them.

2              After being the youngest graduate of George

3    Mason in 2011, able to do pretty much what he wanted, he

4    chose to utilize his immense abilities to develop a

5    device that would allow the blind to use computers in

6    the way that he can use computers.

7              He is good.  He wants to use his talents to

8    make meaningful, substantial contributions to this

9    society.  That is part of what this Court should take

10   into account when it's imposing a sentence.

11             At this point, the Court has imposed a

12   sentence on all of the other coconspirators aside from

13   Sohaib.  So I do think that it is appropriate for this

14   Court to consider Sohaib's conduct relative to the

15   conduct of his coconspirators.

16             THE COURT:  Well, you can eliminate Ishak

17   because he got a Section 5(k) reduction, didn't he?

18             ATTORNEY ABBAS:  (To Attorney Taddei)  If

19   you want --

20             ATTORNEY TADDEI:  Your Honor, I don't

21   believe the government is willing to comment on that in

22   from of open court at this time.  I believe that matter

23   is still under seal.

24             THE COURT:  All right.  I think the sentence

25   I -- is the sentence under seal?

1    ATTORNEY TADDEI:  I believe that it is, your

2    Honor, for some unknown reason.  But we would be happy

3    to --

4    THE COURT:  Do you know what sentence he

5    received, Mr. Abbas?

6    ATTORNEY ABBAS:  There was an indication in

7    the draft report that he was sentenced to six months

8    incarceration.

9    THE COURT:  Yes, but that's after -- that's

10   a distinguishable situation from this.  I will tell you

11   that much right now.

12   ATTORNEY ABBAS:  Yes, your Honor.

13   I want to make clear that that's not where

14   the brunt of this point is going to be made.

15   Judging Sohaib's conduct, I think it's

16   important to understand that, one, the financial benefit

17   that he gained from the credit card scheme that he did

18   participate in was smaller than what his equivalent

19   coconspirator benefited from.

20   The use of government computer systems was

21   without excuse, undoubtedly.  But all the information

22   that he accessed is now securely and exclusively in

23   government hands.

24   Sohaib is committed to providing expedient

25   restitution to right the wrongs that he helped

1    perpetuate and intends on making a substantial

2    restitution payment in the coming days.

3            But Sohaib deserves a chance, I believe, to

4    rebound from the serious mistakes that he has made.

5    This Court doesn't need to worry about deterring Sohaib

6    Akhter from this conduct again in the future.

7            From indictment forward, there aren't

8    allegations that can Sohaib Akhter continued and

9    persisted in the conduct that was illegal, that was

10   troubling to the government, that was in any way, shape

11   or form a violation of his bond conditions.

12           Instead, since indictment he has

13   volunteered.  He has worked with close friends on

14   startups.  He has obtained employment from a cutting

15   edge optical equipment company, and he has sustained

16   that behavior.

17           Sohaib is able to conform his conduct within

18   the parameters of the law, and so the deterrent value of

19   a prolonged period of incarceration against him won't --

20   would be of marginal value.

21           And the promise that he has as an

22   individual -- his youth is a reason why the deterrent

23   value that this Court could project out from a

24   substantial sentence to Sohaib is outweighed by the

25   detriment to Sohaib by that period of incarceration.

1          While the guidelines reflect a sentence --

2     sentencing range in years, we ask this Court

3     respectfully to consider a period of home -- a prolonged

4     period of home confinement that will allow Sohaib Akhter

5     to continue to maintain his skills, support his family,

6     and while making it very clear to him that this conduct

7     is not to be repeated.

8          In the alternative, a short period of

9     incarceration followed by a prolong period of home

10    confinement would be enough of a sentence, but not more

11    than sufficient.

12         Thank you.

13         THE COURT:  Mr. Taddie.

14         ATTORNEY TADDEI:  Thank you, your Honor.

15              ALLOCUTION BY THE GOVERNMENT

16         ATTORNEY TADDEI:  The government asks for a

17    sentence of 33 months of imprisonment in this case.  And

18    we have been through, pretty much, all of the relevant

19    details at this point, and I would incorporate much of

20    what I said earlier at Muneeb Akhter's sentencing,

21    because I also believe it applies to Sohaib Akhter, as

22    well.  But a few things I wanted to touch on in

23    particular.

24         First is something that Mr. Abbas says.

25    What did this defendant choose to utilize his immense

1    abilities to do?

2              In the circumstances of this case and in the

3    conduct that he pled guilty to, what he chose to use his

4    immense abilities to do was, one, assist his brother and

5    a coconspirator in stealing thousands of people's credit

6    card information and using for that financial gain.

7              But honestly, more trouble from the

8    government's perspective, as it specifically adheres to

9    Sohaib Akhter, he was an employee who contracted and

10   worked within the State Department, and he spent, you

11   know, several months working there.

12             And a lot of this is particularly

13   problematic when it's placed in context by a

14   conversation that Mr. Akhter and his brother had back in

15   June of 2014, when Muneeb Akhter started work at the

16   Department of Homeland Security.

17             In that conversation, which is in the PSR

18   and the statement of facts, the brothers discuss, you

19   know, if you can get -- getting a job at a government

20   facility -- which Muneeb Akhter had -- about lying in

21   wait, about trying to figure out insider protection

22   methods, and about using viruses or malware strains, and

23   retooling them such that they can become a weapon.

24             And if you look at the pattern of conduct

25   here -- and yes, that was a conversation, but I think

1    it's really indicative of a lot of what happened after

2    this, in the defendant's behavior.

3           He then got a job at ActionNet.  He spent

4    some time there, and after a period of time he started

5    looking up people's passport information, more than 60

6    people whose passport information he accessed,

7    including, as we have been over in detail, the

8    government agent who was investigating them.

9           And then he took that information and he

10   removed it from the computer system, without real regard

11   of what risks that might present.

12          Whether or not these defendants were going

13   to use it personally -- a factor that they did discuss

14   and did talk about -- there was no consideration of the

15   idea that this information could fall into, potentially,

16   someone else's hands, or that his brother might do

17   something with it, as he was threatening to do.

18          There just appears to be no real respect for

19   electronic boundaries, and for the sanctity of people's

20   personal information.

21          And then what happens at the State

22   Department is you have an individual who quite clearly

23   plots to go in on a weekend, when no one else is around,

24   and has the temerity to drill a hole in a wall and take

25   an electronic device and try to put it and install it in

1    such a way that nobody would be able to find it, because

2    he is getting transferred to another facility.

3            And, again, he has a conversation where he

4    hypothesizes about things that can be done with it, how

5    it could be done to access information, used to create

6    and sell passport and visa data on the Darknet --

7    really, really troubling conversation and really

8    troubling potential conduct.

9            And fortunately, in this circumstance, the

10   government was able to discover this plot quickly

11   enough.  But we don't know what they would have done

12   with this information had we not.

13           And that gets to, really, sort of the root

14   of the problem.  In addition to the great threat that

15   this represents, the defendants in this case, and in

16   particular Mr. Akhter here, appeared to have no respect

17   for the risks that this behavior incorporated, and for

18   the things that can be done with that sort of access.

19           And particularly at a point in time right

20   now, your Honor, where hacking of corporations and

21   particularly government computer systems is an

22   increasing problem in society, a significant term of

23   imprisonment is important, not just to deter this

24   particular defendant, but to deter other defendants that

25   might consider engaging in similar conduct, and conduct

1     that the government, quite frankly, may not be as lucky

2     in figuring out in time before something truly serious

3     happens in this case.

4              It was charged as a conspiracy here because

5     the plan here was ultimately unsuccessful.  But that

6     doesn't diminish the seriousness of the conduct here,

7     nor the need for a stiff sentence here.

8              And lastly, your Honor, as I mentioned for

9     Mr. Muneeb Akhter, the defendant, as we have been

10    through, has had many advantages in life.  He's had a

11    phenomenal education.  He has a phenomenal family.  He

12    has been given basically everything a young man would

13    desire in terms of education and job opportunities.

14             And he has chosen to utilize those immense

15    abilities to steal, to hack into government computer

16    systems, to remove people's personal information, and we

17    ask that he be held accountable for those actions here

18    today, your Honor.

19             THE COURT:  Mr. Abbas, you indicated you had

20    a witness.  Who is that witness and what do you proffer

21    he would --

22             ATTORNEY ABBAS:  Yes.  The witness was James

23    Arcieri (phonetics), who is an executive at IBM, who

24    also runs a startup called FitBud.  He knows Sohaib from

25    college, and --

1          THE COURT:  Proffer what he would testify

2     to.

3          ATTORNEY ABBAS:  He would testify that

4     Sohaib can, in fact, conform his conduct with the law,

5     and that he is able to utilize computers in a

6     professional, lawful manner.

7          And James, as someone who has something to

8     lose, both as a startup owner and as a business

9     executive, would have said that he is so sure of that,

10    that he is happy to give access to the code that is at

11    the core of his startup and let Sohaib have access to it

12    and work on it.

13         The reason we wanted to proffer that -- the

14    reason we wanted to have the Court hear that testimony

15    directly in person -- and I understand that that's not

16    the typical route -- is because the government is

17    emphasizing and articulating Sohaib Akhter as a

18    dangerous ongoing threat to the US and to others, and

19    that's not the case.

20         There is no question that Sohaib Akhter

21    committed serious criminal wrongdoing.  There is no

22    question of that.  But Sohaib has already learned his

23    lessen.

24         Last year, before the raid, he was engaged

25    to be married.  As a result of the raid and the criminal

1    process that was going to follow, that engagement was

2    broken off.

3           He will -- it's very clear and very earnest

4    that one of his bigger goals in life was to do work for

5    the Federal Government.  That's what he wanted to do

6    after college.  He has lost that opportunity, probably

7    for the rest of his life.

8           He has lost a lot already, which doesn't

9    mean that this Court doesn't need to punish him; but the

10   punishment should take into account all the things that

11   he has already lost, as well as who he is how he can

12   contribute in the future.

13          And it is the case that Zone D offenders,

14   which is what Sohaib is, Zone D offenders, 12,

15   13 percent of the time are sentenced to some form of

16   alternative sentencing.

17          Whether that takes the form of a split

18   sentence that includes incarceration and home

19   confinement, or whether that includes just home

20   confinement, it is -- it is the case that courts across

21   the country have imposed alternative sentences in such

22   circumstances.

23          And so we respectfully request --

24          THE COURT:  Zone D?

25          ATTORNEY ABBAS:  Yes, your Honor.

1          THE COURT:  All right.  Where in the

2    guidelines does it say that in Zone D they recommend --

3    because it's not mandatory -- but where in Zone D is it

4    recommended that sentences can be split, in Zone D?

5          ATTORNEY ABBAS:  So it's not in the

6    Sentencing Guidelines.  The -- it's -- the Sentencing

7    Commission published a report in June 2015 --

8          THE COURT:  That you attached here.

9          ATTORNEY ABBAS:  Yes, your Honor.

10         THE COURT:  All right.  But it doesn't say

11   anything about Zone D, does it?

12         ATTORNEY ASSAS:  Yes, your Honor.  It does.

13         THE COURT:  All right.  I've got it right

14   here.  Tell me what page it is.

15         ATTORNEY ABBAS:  It's page 19.

16         THE COURT:  All right.  And tell me, what

17   does it say on page 19?

18         ATTORNEY ABBAS:  Table 7 shows the median

19   loss amount for fraud offenders sentenced to alternative

20   was $391,461, compared to a median loss of $636,261 for

21   those sentenced to imprisonment.

22         So this is -- and I am excerpting a part of

23   the section that regards Zone D offenders, and

24   discussing --

25         THE COURT:  You realize Zone D goes up to

1    life in prison.

2              ATTORNEY ABBAS:  Yes, your Honor, but it

3    starts -- it starts much lower, and --

4              THE COURT:  There is nothing, nothing in the

5    guidelines, in the manual or anything else, that says

6    that if the guidelines come out in Zone D, that --

7    anywhere in Zone D, that it's authorized to split a

8    sentence.

9              Let me ask the probation officer.

10             Are you aware of any such statement?

11             THE PROBATION OFFICER:  No, your Honor.

12             ATTORNEY ABBAS:  If the Court issues a

13   downward variance, there is -- there wouldn't be

14   anything --

15             THE COURT:  Oh, a downward variance, I quite

16   agree with you.  If you varied downward to Zone A or

17   Zone B, that's a different matter; but not Zone C.

18             ATTORNEY ABBAS:  And so what the

19   Sentencing --

20             THE COURT:  Zone D.

21             ATTORNEY ABBAS:  -- what the Sentencing

22   Commission report is, it's a statistical analysis of

23   what courts have done with Zone D offenders.

24             And so we --

25             THE COURT:  I asked --

1              ATTORNEY ABBAS:  Yes.

2              THE COURT:  I asked you whether there was

3      any statement authorizing it or even recommending it.

4      There isn't.  It's just an analysis of data.

5              ATTORNEY ABBAS:  Yes, your Honor.  That's

6      what it is.

7              THE COURT:  All right.

8              ATTORNEY ABBAS:  Thank you.

9              THE COURT:  Anything further?

10             ATTORNEY TADDEI:  Nothing from the

11     government, your Honor.

12             THE COURT:  All right.

13             Do you have something, Mr. Akhter?

14             ATTORNEY ABBAS:  Can I -- is it all right

15     that I confer.

16             THE COURT:  Yes, you may confer with him.

17             ATTORNEY ABBAS:  Your Honor, Mr. Akhter has

18     one more brief comment to make.

19             THE COURT:  All right.  I will hear from

20     him.

21             Come to the podium, Mr. Akhter.

22          FURTHER ALLOCUTION BY THE DEFENDANT

23             THE DEFENDANT:  Your Honor, I would like to

24     talk about the number -- the different types of

25     sentences that could be imposed.

1          We are first-time offenders, nonviolent.  We

2    wouldn't be any problem to the communities.

3          I would request that I could be given some

4    time of imprisonment to, instead, community service.

5          I would like to also be able to provide for

6    my family -- I think we talked about that -- as well.

7          In terms of the alternative sentences, the

8    Commission, US Sentencing Commission says that:  The

9    proportion of federal offenders sentenced to

10   alternatives remain low and decreased slightly during

11   the prior decade.

12         They are trying to say that, you know, there

13   should be a higher number of people, you know, within

14   reason, given alternative sentences.

15         Contrary to the -- on page three it says,

16   "Any sentence of probation or any split sentence as a

17   substitute for imprisonment for offenders whose

18   sentencing ranges are in Zone D, necessarily constitutes

19   a downward departure and variance," which we are

20   requesting at this time.

21         Of course, it's not, you know, incumbent on

22   the Court to say that -- give a downwards variance, but

23   we are requesting it.

24         On Table 7 it says -- what is it called --

25   offenders with sentences in Range D, the table that it

1    gives, it says the alternative is imposed and an average

2    offense level of 19.  The average offense level -- the

3    final offense level in our case is 18.  And it says that

4    the median loss amount is 391,000.

5           The loss amount in our case is less than ten

6    percent of that, and we wish to repay it in full.  So I

7    request that, humbly, that the Court takes into

8    consideration an alternative sentence, please.

9           Thank you.

10          THE COURT:  All right.

11          Mr. Taddie?

12          ATTORNEY TADDEI:  Nothing further from the

13   government, your Honor?

14          THE COURT:  Do you know what table he is

15   referring to?

16          ATTORNEY TADDEI:  I don't, your Honor, but I

17   would point you to 5C1.1, Subsection (f) --

18          THE COURT:  Yes.

19          ATTORNEY TADDEI:  -- which states, "If the

20   applicable guidelines range is in Zone D of the

21   sentencing table, the minimum term shall be satisfied by

22   a sentence of imprisonment."

23          Thank you.

24          THE COURT:  Just so I am sure what it is he

25   is looking at, Mr. Abbas, show that to -- show what that

1      is to Mr. Taddie, and give it to the court security

2      officer.  I am sure I have seen it --

3                 ATTORNEY ABBAS:  Yes, your Honor.

4                 THE COURT:  No, you stay there.

5                 THE DEFENDANT:  I have highlighted it.

6                 (Document tendered.)

7                 THE COURT:  This is part of what you

8      submitted earlier, isn't it --

9                 ATTORNEY ABBAS:  Yes, your Honor.

10                THE COURT:  -- Mr. Abbas?

11                I'll give you a moment to read that,

12     Mr. Taddie.  I'll take a five-minute recess and come

13     back and impose sentence after I have reread this.  I am

14     sure I have read it before.

15                (Court recessed.)

16                (Court called to order at 4:20 p.m.)

17                THE COURT:  Well, I have read this for about

18     the second or third time and it is, as I am not

19     surprised to say, misunderstood by you, Mr. Akhter.  I

20     am sure Mr. Abbas understands it.

21                What you focus on is the statement, "Any

22     sentence of probation or any split sentence as a

23     substitute for imprisonment for offenders whose

24     sentencing ranges are in Zone D necessarily constitutes

25     a downward departure or variance."

1              That's imperfectly stated.  It isn't

2    "necessarily constitutes"; it's "necessarily requires a

3    downward departure."

4              It needs -- you have a downward departure or

5    a variance down to that area where a split sentence is

6    possible.  In other words, if you impose a sentence of

7    120 months, you can't say:  Okay, 119 months in

8    probation and 1 month of incarceration.  That is

9    illegal.  It's impossible.  Can't be done.

10             You would have to vary or depart downward

11   into an area of Zone A or Zone B where split sentences

12   are permitted.  That's what this means.

13             Now, there are no departures warranted in

14   this case.  There is no valid ground for a departure

15   that has been raised or that occurs to the Court.

16             Variance are also -- I mean are always

17   possible.  Variance are always within the Court's

18   discretion under 3553(a).

19             Then the question arises, I take -- I think

20   the best way to take Mr. Akhter's statement and

21   Mr. Abbas's argument for home confinement is that I

22   should vary down to a sentence in that area.  And I will

23   address that now at sentencing.

24             Do you see it any differently, Mr. Taddie?

25             ATTORNEY TADDEI:  Not at all, your Honor.

1          THE COURT:  Mr. Abbas?

2          ATTORNEY ABBAS:  No, your Honor.

3          THE COURT:  All right.

4          Mr. Akhter, come to the podium.

5          THE DEFENDANT:  (Complies.)

6          IMPOSITION OF SENTENCE BY THE COURT

7          THE COURT:  Mr. Akhter, you stand convicted

8    of three serious crimes by virtue of your plea, and the

9    law requires that I consider a variety of factors under

10   3553(a) in order to impose a sentence.  And that

11   sentence should be a sentence that is not greater than

12   necessary to achieve the goals that are stated in

13   3553(a).

14          And I must say you've had adequate

15   opportunity to allocute.  Your counsel has submitted a

16   great deal of information, including a ream of

17   information this morning -- although to be fair,

18   Mr. Abbas, a good bit of that had already been

19   submitted.

20          ATTORNEY ABBAS:  Yes, your Honor.

21          THE COURT:  It was a duplicate submission.

22   And part of it was this matter that I just addressed

23   from the article by Courtney Semitch (phonetics), senior

24   research associate of the Office of Research and Data.

25   And I have already made clear what I think is not quite

1    accurately stated by him.

2            But it's -- it's a point that's important to

3    be made and it's important for me to consider.

4            And this sentencing has taken a long time

5    because there is a great deal to consider, and I think

6    it is appropriate.

7            Well, the first question -- or first factor

8    for the Court to consider in imposing an appropriate

9    sentence is your personal history and characteristics.

10           I think I am reasonably familiar with all of

11   that.  You come from a good family, a strong family.

12   You come from a family of achiever.  Your father has a

13   PhD, mother has several degrees, I think in biology or

14   something close to that.  You have an achieving brother

15   and sister, and your twin is a person who has achieved a

16   good deal, as you have.  You all are talented people.

17           Now, I tell all defendants -- you heard me

18   say this to your brother -- that life is making choices

19   and living with the consequences.  You don't determine

20   where you are born.  You don't determine to whom you are

21   born.  You don't determine what talents or what

22   handicaps you are born with.  But you determine in all

23   respects how you respond to all of that.

24           You were fortunate in many respects, in

25   where you were born, to whom you were born, whether you

1   were born with handicaps or talents.

2   You made bad decisions, criminal decisions,

3   and for that there will consequences today.

4   The law requires that I take into account

5   the nature and circumstances of the offense, how serious

6   it was.

7   It was very serious.  Yes, it only amounted

8   to $31,000 or thereabouts in pecuniary loss to victims.

9   But the kind of activity you engaged in is quite

10   serious, and I have taken that into account.

11   Next, the law requires that I impose a

12   sentence that promotes respect for the law, that

13   provides just punishment, and that deters you and deters

14   others.

15   I am convinced that neither you nor your

16   brother are highly likely to commit criminal conduct in

17   the future.  But you both still need to be deterred

18   somewhat.  You need to know that there are bad

19   consequences for criminal decisions.

20   But that's not really drives your sentence.

21   What drives your sentence is the fact that there needs

22   to be just punishment for these offenses, and that

23   others who commit similar offenses have to be deterred

24   by what I do.

25   Your counsel also raises the need to impose

1    a sentence that does not involve unwarranted disparities

2    between the sentence I impose on you and the sentence

3    imposed on others convicted of essentially similar

4    conduct.

5              And I am aware of Mr. Ishak's sentence and I

6    take that into account.  But that's distinguishable

7    circumstances, because I think there was a 5(k).  It may

8    have been under seal, but that needs to come out.

9              In any event, the law also requires, as I

10   said, that I impose a sentence that's not greater than

11   necessary to accomplish all of this.

12             Now, your counsel has asked for a sentence

13   of home confinement.  I don't agree.  Home confinement

14   is not punishment.  Sitting him with a clicker, TV set

15   and a beer is not punishment, and punishment needs to be

16   meted out here for this conduct.

17             You have argued, and your counsel indirectly

18   argued -- you both argued -- for an opportunity to -- I

19   think you said you wanted to work for two or three

20   months to pay back the restitution.

21             Well, there will be a period of time.  I am

22   going to permit you to surrender voluntarily, and I may

23   well give you that time.  It won't be any longer, I can

24   guarantee you.

25             In the end, a judgment has to be made,

1    Mr. Akhter, as to what sentence is appropriate for this

2    conduct.  I don't think that, yet, you see the conduct

3    as seriously as I think it is.  I truly don't think you

4    see it as seriously -- as serious as I think that

5    conduct really is.  It is very serious conduct.

6              And the guidelines reflect that.  Your

7    guidelines, indeed, are -- and I should take those into

8    account -- your guidelines are --

9              He is at a level what now, Mr. Abbas?

10             ATTORNEY ABBAS:  Eighteen?  Am I correct?

11             THE COURT:  Eighteen.

12             ATTORNEY TADDEI:  That's correct, your

13   Honor.

14             THE COURT:  27 to 33; and the government has

15   asked for a sentence of 33 months, given those

16   guidelines.

17             Well, the government came in here today

18   thinking the guidelines were going to be higher than

19   that.

20             Am I correct, Mr. Taddei?

21             ATTORNEY TADDEI:  That's correct, your

22   Honor.  That is also reflected in our initial

23   recommendation.

24             THE COURT:  That is, that it would be

25   greater than 33.

1          ATTORNEY TADDEI:  Yes, your Honor.

2          THE COURT:  I understand that.  The

3  government views it as serious.

4          But I take into account your -- a lot of

5  your personal history and characteristics.  I was

6  impressed with what you've done charitable, what you

7  have done with some resources and your time and how you

8  have helped people.  I think -- I take that into

9  account.

10          Ultimately, I have to make a judgment as to

11  an appropriate sentence.

12          And it is the Court's judgment that you be

13  committed to the custody of the Bureau of Prisons for a

14  period of 24 months.

15          And upon release from confinement, you are

16  to serve three years of supervised release.

17          And the 24 months is for all three counts.

18  It's to run concurrently for each count.

19          And similarly, the period of supervised

20  release is for each count, three years, but those terms

21  are to run concurrently, as are the terms of

22  incarceration.

23          I'll permit you to surrender voluntarily.

24  And I'll put the surrender date -- Ms. Riffle, let's

25  make it a hundred days from today.  He's got a hundred

1     days to get everything done.

2              THE PROBATION OFFICER:  Yes, your Honor.

3              THE COURT:  And I will impose restitution in

4     the amount of the 31,000.

5              Do you have the order there, Mr. Taddie?

6              ATTORNEY TADDEI:  We do, your Honor.

7              ATTORNEY ABBAS:  Yes.

8              THE COURT:  All right.  Hand that order up.

9              And there should be a forfeiture order as

10    well.

11             ATTORNEY ABBAS:  Let's just confirm that --

12             THE COURT:  And a $100 special assessment

13    for each count, for a total of $300.

14             I don't impose any punitive fine to cover

15    the costs of incarceration or supervised release, or any

16    punitive fine at all in view of your significant

17    restitution obligation.

18             It gives me no pleasure to impose sentences

19    on any defendant.  I don't like doing it.  It's not the

20    most pleasant part of this job.  Indeed --

21             THE DEFENDANT:  Can I say something very

22    briefly about --

23             THE COURT:  Speak up.

24             THE DEFENDANT:  Can I say something very

25    briefly --

1          THE COURT:  Yes, you can.

2          THE DEFENDANT:  -- about community service?

3          THE COURT:  Oh, I am going to put that on

4    there, but it's not going to be a substitute for

5    anything.

6          THE DEFENDANT:  Okay.

7          THE COURT:  I am going to require that you

8    do 60 hours of community service as a condition of your

9    supervised release.

10          Now what I want that community service

11    focused on is I want you to write an article or

12    articles, to be posted on the Internet, describing your

13    personal experience and as a warning to people not to

14    engage in the conduct you engaged in.

15          I also -- you can perform that community

16    service by appearing at high schools or colleges and

17    telling people about your personal experience, and

18    warning them against the kind of conduct you engaged in.

19          Now, did you want to say anything else?

20          You were thinking you were going to

21    substitute community service for the incarceration.  No,

22    sir.

23          I think, Mr. Akhter, you still don't grasp

24    how serious this conduct was.

25          THE DEFENDANT:  Now I do.

1          THE COURT:  I have no doubt that you will

2     emerge from this experience a stronger and better

3     person.  You are already -- I think your counsel is

4     exactly right.  You are essentially a good person.  You

5     wouldn't do all the charitable things you've done if you

6     weren't a charitable person.

7          But you can't steal from people.  You can't

8     break into computers.  You can't use the skill you have

9     for bad purposes.  It's very serious, extremely serious.

10     The guideline ranges reflect that.  And I varied

11     downward from that, and I chose not to vary downward to

12     split the sentence.  I don't think that's appropriate.

13          THE DEFENDANT:  Thank you for your judgment.

14          THE COURT:  Anything further?

15          Have I omitted anything, Ms. Riffle?

16          Oh, the special conditions of supervised

17     release.  They are as follows:

18          You are to comply with the requirements of a

19     computer monitoring program to be administered and

20     directed by the Probation Office.  You'll have to

21     consent to the installation of computer monitoring

22     software on any computer that you use at home and have

23     access to.

24          That doesn't apply to computers at your

25     employer.  You know, if your employer allows you to use

1    a computer, you have to reveal to an employer this

2    conviction.  And if they -- I think you have some people

3    who believe -- have faith in you and are prepared, as

4    your counsel proffered to the Court, prepared to let you

5    have access to their computer system.  That's fine.  The

6    Probation Office won't interfere with that.

7              And I would assume that having gone through

8    this experience, you won't abuse that trust --

9              THE DEFENDANT:  Yes.

10             THE COURT:  -- in the future.

11             But you'll also have to incur -- don't incur

12   any credit charges or open additional lines of credit

13   without approval of the probation officer.

14             Now that ceases once restitution is paid.

15   Once restitution is paid, he doesn't have to get

16   approval of the probation officer for that.

17             And that restitution is joint and several

18   with Mr. Akhter's brother; is that right?

19             ATTORNEY TADDEI:  Restitution is joint and

20   several with Mr. Akhter's brother, as well as Mr. Ishak

21   in the order forthcoming.

22             THE COURT:  Mr. Ishak, as well.

23             So once that's all paid off, they don't need

24   to get permission to get credit.

25             And it is joint and several.  So if

1    Mr. Akhter, Sohaib Akhter, pays it all off, then that

2    relieves Muneeb and Ishak.

3              I guess I am using -- mixing up first names

4    and last names.  But that's my unfamiliarity.  It would

5    be -- it would relieve Mr. Muneeb Akhter's and

6    Mr. Mosevik Ishak's obligation if Mr. Sohaib Akhter pays

7    it all off.

8              Now, he will also have to provide the

9    probation officer with access to any requested financial

10   information, and apply all monies received from income

11   tax refunds and lottery winnings, inheritances, that

12   sort of thing, to the restitution obligation.

13             And I have a forfeiture order, too, as well.

14   I'll enter both the restitution and the forfeiture

15   order.

16             Now, this doesn't mean that I am heartless

17   about your family and your father being out of a job and

18   all of that sort of thing.  Of course that's a hardship.

19   But they will -- you know, your activity doesn't affect

20   just you.  That's part of being a family.  They will

21   simply have to make do.

22             Anything further from the government in this

23   sentencing today?

24             ATTORNEY TADDEI:  Nothing further.  Thank

25   you, your Honor.

1        THE COURT:  Mr. Abbas?

2        ATTORNEY ABBAS:  Your Honor, would you be

3   willing to recommend that he be placed in a facility

4   close to the DC Metro Area?

5        THE COURT:  Yes, I'll recommend that.

6        But, as I said with respect to his brother,

7   the Bureau of Prisons knows they are identical twins.

8   That goes two ways.  One, it militates in favor of

9   putting them together because identical twins, what

10  little I know about identical twins, they do well

11  together, flourish together, and don't do well apart.

12       Well, I don't know if that's true about all

13  identical twins.  I don't know about identical twins.

14  But that's all information the Bureau of Prisons has.

15       The problem is that if they are

16  coconspirators, the Bureau of Prisons rarely puts

17  coconspirators together, for the obvious reason.

18       But I will recommend that he be designated

19  to serve his sentence in a facility close to this area

20  so that he can be near his family, which is clearly a

21  very strong, tightly-knit family, that would be helpful

22  to him in his recovery from this experience.

23       ATTORNEY ABBAS:  Thank you, your Honor.

24  That's it.

25       THE COURT:  Anything else, Mr. Abbas?

1          ATTORNEY ABBAS:  No, your Honor.

2          THE COURT:  Mr. Taddie, anything further?

3          ATTORNEY TADDEI:  Nothing further, your

4     Honor.  Thank you.

5          THE COURT:  Good luck to you.

6          Now, during this period of time that you

7     have between now and your reporting date -- and the

8     probation officer will tell you when and where to

9     report, and you can't miss that.  And it will be a

10    hundred days -- no sooner than a hundred days from

11    today.  But you need to get busy.  She will tell you

12    where and when you have to report.

13          But during the interim, you are subject to

14    all the conditions you have been living under at

15    present.  You understand that?

16          THE DEFENDANT:  Yes, I understand.

17          THE COURT:  That means you can't travel

18    outside the district without the permission of the

19    Court.

20          Mr. Abbas, you are familiar with all of

21    those, and --

22          ATTORNEY ABBAS:  Yes, your Honor.

23          THE COURT:  -- and you will advise your

24    client of that.

25          Now that doesn't mean that if this

1  company -- where you are working now, again, you told

2  me?

3          THE DEFENDANT:  Thorlabs.  It's a company in

4  Herndon, Virginia.

5          THE COURT:  All right.  Now, if they need

6  you to travel somewhere, I am prepared to let you go.

7  If we have advance information and we know about it, we

8  will give you -- within the hundred days -- you can do

9  it.  And I would hope that they will continue to hire

10  you after your period of incarceration is over.

11          THE DEFENDANT:  All right.  Thank you.

12          THE COURT:  Anything further from the

13  probation officer?

14          THE PROBATION OFFICER:  No, your Honor.

15          THE COURT:  All right.  Or anyone one else?

16          ATTORNEY ABBAS:  No, your Honor.

17          THE COURT:  Court stands in recess.

18          (Court adjourned at 4:40 p.m. in USA v

19  Sohaib Akhter.)

20                       ---

21

22

23

24

25

CERTIFICATE

I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the sentencing hearing in the case of UNITED STATES OF AMERICA v. SOHAIB AKHTER.

I further certify that I was authorized and did report by stenotype the proceedings in said sentencing hearing, and that the foregoing pages, numbered 1 to 99, inclusive, constitute the official transcript of said proceedings as taken from my machine shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this __20th__ day of __February_____, 2017.

_____/s/_____
                      Michael a. Rodriquez, RPR/CM/RMR
                          Official Court Reporter